FILED

May 5 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: OP 14-0685

OP 14-0685

IN THE SUPREME COURT OF THE STATE OF MONTANA

2015 MT 118

_____

BARRY ALLAN BEACH,

     Petitioner,

     v.

STATE OF MONTANA,

     Respondent.

O P I N I O N
A N D
O R D E R

_____

¶1     Barry Allan Beach petitions for a writ of habeas corpus, arguing that his sentence of one hundred years of imprisonment without the possibility of parole is unconstitutional under *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455 (2012). The dispositive issue is whether *Miller*'s rule requiring a sentencing judge to consider a juvenile[1] offender's age when sentencing that offender to life without parole applies retroactively on collateral review. We conclude that it does not. We deny Beach's petition.

**PROCEDURAL AND FACTUAL BACKGROUND**

¶2     In 1984, a Roosevelt County jury convicted Beach of deliberate homicide for a crime committed in 1979, when Beach was seventeen. Under Montana's sentencing scheme, the District Court could impose a maximum sentence of one hundred years'

---

[1] In this opinion, "juvenile" refers to a person who committed a crime when under the age of eighteen.

1

imprisonment without the possibility of parole. *See* §§ 45-5-102(2), 46-18-202(2), -222, -305, MCA (1978). On May 11, 1984, following its consideration of a written presentence investigation report and statements by both Beach and the prosecutor in open court, the District Court imposed the maximum sentence. Beach concedes that the sentence was within the discretion of the District Court and that the sentence was not mandated by law. The record does not show that the court expressly considered Beach's youth when imposing the sentence.

¶3     In the years since, Beach repeatedly has attacked his conviction and sentence. *See Beach v. McCormick*, No. 98-35957, 1999 U.S. App. Lexis 20999 (9th Cir.), *cert. denied* 528 U.S. 1194, 120 S. Ct. 1255 (2000); *State v. Beach*, 2013 MT 130, 370 Mont. 163, 302 P.3d 47; *Beach v. State*, 2009 MT 398, 353 Mont. 411, 220 P.3d 667; *Beach v. Day*, 275 Mont. 370, 913 P.2d 622 (1996); *State v. Beach*, 217 Mont. 132, 705 P.2d 94 (1985). Beach now petitions for a writ of habeas corpus, attacking the constitutionality of his sentence under the United States Supreme Court's recent decision in *Miller*.

## STANDARD OF REVIEW

¶4     This Court determines the retroactivity of a constitutional rule as a matter of law. *State v. Reichmand*, 2010 MT 228, ¶ 6, 358 Mont. 68, 243 P.3d 423.

## DISCUSSION

## I.

¶5     As an initial matter, the State urges that Beach's habeas corpus petition is procedurally barred.

2

¶6 Article II, Section 19 of the Montana Constitution provides, "The privilege of the writ of habeas corpus shall never be suspended." Under Montana's statutory scheme for reviewing claims by convicted offenders, habeas corpus is not the method for collaterally reviewing the conviction or sentence of a person who has been adjudged guilty of a crime and has exhausted direct appeal. Section 46-22-101(2), MCA. Rather, a petition for postconviction relief is the method by which an offender who has been found guilty may collaterally attack his conviction or sentence. Section 46-21-101(1), MCA. Petitions for postconviction remedies carry strict limitations. *See* § 46-21-102, MCA. In *Lott v. State*, 2006 MT 279, 334 Mont. 270, 150 P.3d 337, we held that statutory limitations on the availability of the writ of habeas corpus are unconstitutional under Article II, Section 19 of the Montana Constitution as applied to an offender sentenced to a "facially invalid sentence" where the facial invalidity stems from a rule created after time limits for directly appealing or petitioning for postconviction relief have expired. *Lott*, ¶ 22.

¶7 The State argues that *Lott* does not apply because Beach's sentence is not facially invalid. Beach counters that the recent United States Supreme Court decision in *Miller* makes his sentence facially invalid. *Miller* requires following a certain procedure before sentencing a juvenile to life without the possibility of parole. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2471. Beach is imprisoned under a sentence that he argues equates to life without parole. Because *Miller* was not announced until 2012, Beach could not have raised a claim under that case until after time limits for direct review and postconviction relief had run. In these circumstances, we are satisfied that Beach's claim sufficiently

3

calls into question the facial validity of his sentence to lift the statutory bar to a petition for habeas corpus relief.

**II.**

¶8  The United States Constitution's Eighth Amendment prohibits cruel and unusual punishment. "The concept of proportionality is central to the Eighth Amendment." *Graham v. Florida*, 560 U.S. 48, 59, 130 S. Ct. 2011, 2021 (2010). While in practice the concept of proportionality does not affect most sentences, *see generally*, *Ewing v. California*, 538 U.S. 11, 123 S. Ct. 1179 (2003), proportionality bears on the harshest types of punishments when an Eighth Amendment challenge is raised.

¶9  Because of the concept of proportionality, the Eighth Amendment requires individualized sentencing in death penalty proceedings to determine whether that punishment corresponds to an offender's character, circumstance, and crime. *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S. Ct. 2954, 2964-65 (1978); *Woodson v. North Carolina*, 428 U.S. 280, 303-05, 96 S. Ct. 2978, 2991-92 (1976). Further, the death penalty categorically represents an unconstitutionally disproportionate punishment when imposed for certain crimes (like non-homicide offenses, *Kennedy v. Louisiana*, 554 U.S. 407, 438, 128 S. Ct. 2641, 2660 (2008)), and on certain classes of offenders with lesser capacities (like intellectually disabled persons, *Atkins v. Virginia*, 536 U.S. 304, 321, 122 S. Ct. 2242, 2252 (2002), and juveniles, *Roper v. Simmons*, 543 U.S. 551, 575, 125 S. Ct. 1183, 1198 (2005)).

4

¶10   The Supreme Court recently made clear that a sentence of life imprisonment without the possibility of release, though not the harshest punishment for an adult offender, is subject to more exacting scrutiny when imposed on a juvenile. In *Graham*, the Supreme Court held that life without parole represents a categorically disproportionate sentence for a juvenile convicted of a non-homicide offense. *Graham*, 560 U.S. at 75, 130 S. Ct. at 2030. Next, in *Miller*, the Court considered the proportionality of life without parole imposed on a juvenile for a homicide offense. The *Miller* Court declined to address whether the Eighth Amendment categorically bars a life without parole sentence imposed on a juvenile convicted of homicide. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469. The Court instead specified that appropriate circumstances to impose such a sentence are "uncommon." *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469. To ensure that imposing life without parole on a juvenile homicide offender is proportional, the Eighth Amendment requires that, before imposing such a sentence, a sentencer "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469. Accordingly, the Eighth Amendment "forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders" because such a scheme prevents a sentencer from taking into account constitutionally necessary considerations. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469.

¶11   Beach argues that his sentence equates to life without parole. Beach concedes that *Miller*'s holding forbidding mandatory life without parole sentences does not apply to his

5

case because his sentence was not mandatory. Both at the time of Beach's offense and now, Montana sentencing statutes have prescribed an individualized sentencing procedure that allows the sentencing court, after considering all circumstances of the offender and the offense, to fashion a sentence within the range provided by the statute under which the offender was convicted. *See* §§ 46-18-101, -201, MCA (1978); §§ 46-18-101, -201, MCA (2013). Nevertheless, Beach argues that his sentence is unconstitutional under *Miller* because his sentencer did not consider how Beach's age counseled against his sentence.[2]

¶12 Beach's conviction and sentence became final for purposes of direct review in 1985. *Miller* was announced in 2012. Beach may benefit from *Miller* only if *Miller* creates a rule that applies to a sentence imposed years before *Miller* was issued.

## III.

## A.

¶13 Beginning with *Linkletter v. Walker*, 381 U.S. 618, 85 S. Ct. 1731 (1965), the United States Supreme Court struggled for over two decades with how and when to apply constitutional rules retroactively in criminal cases. Justice Harlan was the most influential critic of the Court's retroactivity approach during this period. In dissents in *Mackey v. United States*, 401 U.S. 667, 91 S. Ct. 1160 (1971), and *Desist v. United States*, 394 U.S. 244, 89 S. Ct. 1030 (1969), Justice Harlan devised an alternative approach for determining retroactivity.

---

[2] In this opinion, we assume without deciding that Beach was sentenced to the equivalent of life without parole.

¶14 The distinction between direct and collateral review represents the central feature of Justice Harlan's framework. Justice Harlan believed that the judicial function requires applying all rules of constitutional law to cases yet to be tried and on direct review. *Mackey*, 401 U.S. at 681.[3] But Justice Harlan also believed that new rules generally should not apply retroactively to offenders on collateral review because of the interest in finality that attaches once direct review ends, administrative costs associated with retrial years after the fact, and the historic functions of habeas corpus.[4] *Mackey*, 401 U.S. at 689-92. Justice Harlan conceived of two exceptions to the general rule of non-retroactivity on collateral review. The first exception is for new substantive rules that place "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe." *Mackey*, 401 U.S. at 692. Justice Harlan reasoned that substantive rules lessen the interest in finality because "[t]here is little

---

[3] Justice Harlan's dissent in *Mackey* was never printed in the Supreme Court Reporter. We cite only to where it appears in the United States Reports.

[4] In Montana, direct review occurs when an offender is convicted by a state court and, in the months following that conviction, appeals her decision to the Montana Supreme Court and (if federal issues are involved) seeks appeal with the United States Supreme Court. Under Justice Harlan's framework, a rule announced by the United States Supreme Court will benefit an offender while her claim is still pending on direct review. After an offender exhausts direct review, her claim becomes final, and she thereafter may seek only collateral review. Collateral review has two stages. In the first stage, the offender may petition Montana courts, including this Court, for collateral review (usually styled as a petition for postconviction relief, but sometimes, as in this case, styled as a petition for a writ of habeas corpus), and may appeal this Court's decision on federal issues to the United States Supreme Court. In the second collateral review stage, the offender may seek federal habeas corpus review on federal issues from a federal district court, a federal court of appeals, and the United States Supreme Court. Under Justice Harlan's framework, a new rule announced after an offender's conviction has become final—when only collateral review remains—generally will not apply retroactively to benefit an offender.

societal interest in permitting the criminal process to rest at a point where it ought properly never to repose." *Mackey*, 401 U.S. at 693. Moreover, because conduct that is no longer punishable cannot be retried, overturning a conviction based on a substantive rule does not tax the state through requiring another trial. Substantive rules also echo the historic availability of habeas corpus to attack a court's jurisdiction to imprison a person. *Mackey*, 401 U.S. at 692-93.

¶15  Justice Harlan's second exception encapsulates procedural rules that are "implicit in the concept of ordered liberty" and "alter our understanding of the bedrock procedural elements" necessary to the fairness and accuracy of a conviction. *Mackey*, 401 U.S. at 693 (citation omitted); *Desist*, 394 U.S. at 262, 89 S. Ct. at 1041. Justice Harlan offered the rule from *Gideon v. Wainwright*, 372 U.S. 335, 345, 83 S. Ct. 792, 806 (1963) (requiring that an indigent defendant be provided counsel), as an example of a rule satisfying this exception. *Mackey*, 401 U.S. at 694.

¶16  In *Griffith v. Kentucky*, 479 U.S. 314, 107 S. Ct. 708 (1987), the United States Supreme Court adopted the first leg of Justice Harlan's framework, stating that any newly-announced constitutional rule will apply to cases still pending on direct review. *Griffith*, 479 U.S. at 328, 107 S. Ct. at 716. Then, in *Teague v. Lane*, 489 U.S. 288, 109 S. Ct. 1060 (1989), a plurality of the Court adopted the remainder of Justice Harlan's framework, holding that new rules generally will not apply retroactively to cases on collateral review. *Teague*, 489 U.S. at 310, 109 S. Ct. at 1075. A rule is new when "not *dictated* by precedent existing at the time the . . . conviction became final." *Teague*, 489

8

U.S. at 301, 109 S. Ct. at 1070 (emphasis in original). Echoing Justice Harlan, after *Teague*, "[a] new rule applies retroactively in a collateral proceeding only if (1) the rule is substantive or (2) the rule is a watershed rul[e] of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Whorton v. Bockting*, 549 U.S. 406, 416, 127 S. Ct. 1173, 1180 (2007) (internal quotation marks and citations omitted).[5]

¶17 Although this framework originally focused on the retroactivity of rules used to attack convictions, the Supreme Court has refined the framework in cases attacking sentences. In *Penry v. Lynaugh*, 492 U.S. 302, 109 S. Ct. 2934 (1989), Penry argued on collateral review that the Eighth Amendment prohibits imposing the death penalty on an intellectually disabled person. *Penry*, 492 U.S. at 328, 109 S. Ct. at 2952. Before reaching the merits of that claim, the Court conducted the *Teague* retroactivity analysis. The Court noted that Justice Harlan's description of a substantive rule—one that places "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe"—is phrased in terms of "substantive *categorical* guarantees accorded by the Constitution, regardless of the procedures followed." *Penry*, 492 U.S. at 329, 109 S. Ct. at 2952 (emphasis added). Because, in the context of sentencing, rules that "deprive[ ] the State of the power to impose a certain penalty" or

---

[5] We recognize that courts (including this Court and the United States Supreme Court) have struggled with whether a substantive rule is an exception to the general rule of non-retroactivity, or whether the general rule of non-retroactivity simply does not apply to substantive rules. *See Schriro v. Summerlin*, 542 U.S. 348, 351 n.4, 124 S. Ct. 2519, 2523 n.4 (2004); *State v. Whitehorn*, 2002 MT 54, ¶ 37, 309 Mont. 63, 43 P.3d 922 (2002). We think this a distinction without significance. In this opinion, we refer to substantive rules as exceptions to the general rule of non-retroactivity.

prohibit a "certain category of punishment for a class of defendants because of their status or offense" also are categorical guarantees, the Court determined that these types of sentencing rules are substantive. *Penry*, 492 U.S. at 329-30, 109 S. Ct. at 2952-53. The Court accordingly concluded that Penry's claim called for a substantive rule not subject to the general rule of non-retroactivity. *Penry*, 492 U.S. at 330, 109 S. Ct. at 2953.

¶18    By contrast, the Court has held that sentencing rules that do not "prohibit the imposition of [a particular sentence] on a particular class of persons" are not substantive. *Saffle v. Parks*, 494 U.S. 484, 495, 110 S. Ct. 1257, 1263-64 (1990) (concluding that a prohibition against instructing a death penalty jury to avoid sympathy when determining punishment is not a substantive rule). *See also Sawyer v. Smith*, 497 U.S. 227, 242, 110 S. Ct. 2822, 2831 (1990) (concluding that the substantive rule exception "has no application" to a new rule prohibiting the imposition of capital punishment by a jury that has been led to believe that the ultimate decision to impose the death penalty rests elsewhere).

¶19    The United States Supreme Court further clarified the scope of the exceptions to the general rule of non-retroactivity for sentencing rules in *Schriro v. Summerlin*, 542 U.S. 348, 124 S. Ct. 2519 (2004). The offender in that case sought to benefit from the rule announced in *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428 (2002), requiring that a jury rather than a judge find aggravating factors necessary to impose a death sentence. *Schriro*, 542 U.S. at 351, 122 S. Ct. at 2522. The *Schriro* Court stated, "A rule is substantive rather than procedural if it alters the range of conduct or the class of persons

10

that the law punishes. . . . In contrast, rules that regulate only the *manner of determining* the defendant's culpability are procedural." *Schriro*, 542 U.S. at 353, 124 S. Ct. at 2523 (emphasis in original). Substantive sentencing rules that "place particular conduct or persons covered by the statute beyond the state's power to punish" are retroactive because they "necessarily carry a significant risk" that the offender "faces a punishment that the law cannot impose upon him." *Schriro*, 542 U.S. at 352, 124 S. Ct. at 2522-23 (internal quotation marks and citation omitted). The Court concluded that the *Ring* rule was not substantive because "the range of conduct punished by death . . . was the same before *Ring* as after." *Schriro*, 542 U.S. at 354, 124 S. Ct. at 2524.

¶20 The Court instead determined that the *Ring* rule was procedural because it "altered the range of permissible methods for determining whether a defendant's conduct is punishable by death." *Schriro*, 542 U.S. at 353, 124 S. Ct. at 2523. The Court held that the *Ring* rule was not a watershed procedural rule, however, because it did not create an "impermissibly large risk" of inaccuracy. *Schriro*, 542 U.S. at 356, 124 S. Ct. at 2525 (citations omitted). The *Schriro* Court's determination that the *Ring* rule was not watershed is consistent with its application of that exception. Since adopting Justice Harlan's framework in 1989, the Supreme Court has never concluded that a new rule fits into the watershed procedural rule exception, and has stated that it is "unlikely" it ever will. *Teague*, 489 U.S. at 313, 109 S. Ct. at 1077. During that time, the Supreme Court has provided only one example of a rule that meets the watershed procedural rule exception—the rule announced in *Gideon*.

11

**B.**

¶21 The Montana Supreme Court has applied the federal retroactivity framework since *State v. Egelhoff*, 272 Mont. 114, 125-27, 900 P.2d 260, 267 (1995). For example, in *State v. Whitehorn*, 2002 MT 54, 309 Mont. 63, 50 P.3d 121, we examined the retroactivity of the rule we announced in *State v. Guillaume*, 1999 MT 29, 293 Mont. 224, 975 P.2d 312.

¶22 *Guillaume* held that applying a weapons enhancement statute on top of an offense that already includes use of a weapon in the elements of the offense is unconstitutional under Montana's double jeopardy clause. *Guillaume*, ¶ 16. In *Whitehorn*, after surveying the federal retroactivity framework, we held that *Guillaume* was retroactive because it created a substantive rule: the rule prohibited imposition of a certain punishment (an additional punishment for use of a weapon) on a particular class of offenders (offenders who already had been punished for the same conduct). *Whitehorn*, ¶¶ 36-42.

¶23 This Court's *Egelhoff* decision appears to have assumed that the United States Constitution requires state courts to apply the federal retroactivity framework. *See Egelhoff*, 272 Mont. at 125, 900 P.2d at 267 ("With regard to the question of retroactivity, the United States Supreme Court has additionally made its position more clear and we find this also to be binding upon us."). In *Danforth v. Minnesota*, 552 U.S. 264, 128 S. Ct. 1029 (2008), the United States Supreme Court clarified that its retroactivity analysis need not be followed by state courts. *Danforth*, 552 U.S. at 280-81, 128 S. Ct. at

12

1041. *Danforth* noted that *Egelhoff* placed this Court among three state high courts that incorrectly concluded that states *must* apply the federal retroactivity framework. *Danforth*, 552 U.S. at 281 n.17, 128 S. Ct. at 1042 n.17. Nonetheless, we have continued to apply the federal framework in the years since *Danforth*. In *Reichmand*, 2010 MT 228, 358 Mont. 68, 243 P.3d 423, we recognized this Court's "right to craft its own unique retroactivity jurisprudence, using federal requirements as a floor," before employing the *Griffith* principle that rules are retroactive on direct review to address a claim under a state constitutional right.[6] *Reichmand*, ¶¶ 13-15. Just recently, in *State v. Cook*, 2012 MT 34, 364 Mont. 161, 272 P.3d 50, we recognized the distinction between substantive and procedural rules for purposes of determining retroactivity on collateral review. *Cook*, ¶ 17. We applied the federal framework to determine that the rule the petitioner invoked was not retroactive because, although it was new and procedural, it was not watershed. *Cook*, ¶¶ 17-19.

¶24    Against this backdrop of faithful application, Beach has not made a principled argument for departing from the United States Supreme Court's retroactivity framework to resolve his petition. In both his briefs and in oral argument, Beach focused on showing that *Miller* is retroactive under the federal retroactivity framework. Beach's briefing on applying a state-specific retroactivity standard is scant, and his oral argument raised the

---

[6] *Reichmand* also suggested that "the U.S. Supreme Court's retroactivity analysis for *federal* constitutional errors is binding upon the states when *federal* constitutional errors are involved." *Reichmand*, ¶ 13 (emphasis in original). This statement is correct to the extent that it means that the federal doctrine effectively sets the floor for the retroactivity of federal rights in Montana. But this statement should not be taken to mean that this Court cannot provide greater retroactivity to federal rights than permitted under the federal standard—under *Danforth*, we are not required to employ the federal retroactivity analysis for either federal or state rights.

possibility of a different standard only briefly, in rebuttal to the State's argument. In neither his briefs nor in oral argument did Beach specify what standard we should apply if not the retroactivity standard we have applied in previous cases.

¶25    In the limited argument Beach has developed on departing from the retroactivity framework, he has suggested that *Miller* should be applied retroactively to his case because *Miller* implicates fundamental rights found in Article II, Sections 15 and 22 of the Montana Constitution. Beach also recounts *Whitehorn*'s comment that "it is illogical for this Court to refuse to extend constitutional protections to citizens simply because their claims are raised by collateral review rather than by way of direct appeal." *Whitehorn*, ¶ 42. He fails to note, however, the very next line in that opinion: "Accordingly, we conclude that . . . this Court erred in failing to recognize and apply the foregoing case law *that distinguishes a procedural rule from a substantive rule when addressing retroactivity*." *Whitehorn*, ¶ 42 (emphasis added). In *Whitehorn*, we applied the federal retroactivity framework, recognizing the illogic of not applying substantive rules retroactively when that would permit "the criminal process to rest at a point where it ought properly never to repose." *Mackey*, 401 U.S. at 693 (Harlan, J., dissenting).

¶26    Beach has failed to explain why the cited provisions of the Montana Constitution require a different retroactivity model for *Miller*. *See State v. Covington*, 2012 MT 31, ¶ 21, 364 Mont. 118, 272 P.3d 43. Beach has further failed to address why *Miller* requires retroactive application in light of the interests that collateral review affects and the purposes that it serves. We are not obligated to develop legal analysis that may lend

14

support to an appellant's arguments. *In re Estate of Bayers*, 1999 MT 154, ¶ 19, 295 Mont. 89, 983 P.2d 339 (1999).

¶27 Two of today's dissenting opinions develop their own legal analyses, each proffering a new path for determining retroactivity not advanced by Beach. Justice Wheat offers an ad hoc approach, suggesting that the Court simply compare the interests of fairness and finality to determine the retroactivity of the rule invoked in this case. Dissent, ¶ 60. But his Dissent does not offer a measure by which to compare these interests. Nor does it acknowledge the aspects of fairness that the interest in finality subsumes—stability in the law, timely resolution of disputes, and closure for everyone involved in a case, including victims. Dissent, ¶¶ 63-65; *see Mackey*, 401 U.S. at 691 (Harlan, J., dissenting) ("No one, not criminal defendants, not the judicial system, not society as a whole is benefited by a judgment providing a man shall tentatively go to jail today, but tomorrow and every day thereafter his continued incarceration shall be subject to fresh litigation on issues already resolved."). The logical conclusion of Justice Wheat's approach is that a conviction would never be final in this state until a reviewing court deems it "fair" to so declare.

¶28 Meanwhile, Justice Shea would embark on a novel state-specific approach to retroactivity by overruling several prior decisions of this Court. He posits that those decisions perpetuated *Egelhoff*'s mistaken assumption that we are bound to apply the federal retroactivity framework. Dissent, ¶ 97. Justice Shea faults the Court's analysis in *Reichmand*, but overlooks our express, and correct, observation in that case that *Danforth*

15

permits this Court to adopt any retroactivity standard with regard to state constitutional rights. *Reichmand*, ¶ 13. In *Reichmand*, we examined the retroactivity of a new rule affecting a state constitutional right. *Reichmand*, ¶ 2. After acknowledging our ability to choose any standard, we applied the federal retroactivity framework to that state right. *Reichmand*, ¶ 15. We did likewise in *Cook*, where we reaffirmed that "[r]etroactive application is needed in situations that 'necessarily carry a significant risk that a defendant stands convicted of an act that the law does not make criminal' or faces a punishment that the law cannot impose upon him." *Cook*, ¶ 17 (quoting *Schriro*, 542 U.S. at 351, 124 S. Ct. at 2522-23). It cannot be said that the Court did not "voluntarily" make the federal retroactivity framework its own in these two cases. Dissent, ¶ 100.[7]

¶29 Most importantly, Justices Wheat and Shea's respective theories could have been, but were not, argued by Beach. As a result, this Court has not had the benefit of the State's position on the approaches that Justices Wheat and Shea would have us adopt. Under this Court's policy of stare decisis, we keep faith with precedent "unless it is demonstrably made to appear that" our precedent "manifestly is wrong." *State ex rel. Perry v. Dist. Ct.*, 145 Mont. 287, 310, 400 P.2d 648, 660 (1965) (citation omitted). The burden of this demonstration is on the party seeking to overturn the precedent. *See In re McCabe*, 168 Mont. 334, 337, 544 P.2d 825, 827 (1975) (noting the petitioner's failure to

---

[7] The Dissent's reference to *State v. Maine*, 2011 MT 90, 360 Mont. 182, 255 P.3d 64, does not bolster its analysis. Our decision in *Maine* was supported by precedent going back decades. *Maine*, ¶ 45 (Baker, J., concurring). In this case, our precedent, reaffirmed most recently in *Reichmand* and *Cook*, dictates a result in conflict with what Justice Shea proposes. In addition, *Maine* addressed arguments squarely presented and briefed by the parties. *Maine*, ¶ 27.

"demonstrate any sufficient reason for this Court to overturn" its prior construction); *see also U.S. v. Int'l Bus. Mach. Corp.*, 517 U.S. 843, 856, 116 S. Ct. 1793, 1801 (1996) ("Though from time to time we have overruled governing decisions that are unworkable or are badly reasoned, we have rarely done so on grounds not advanced by the parties.") (internal citations and quotations omitted). Beach has not met his burden to so demonstrate, and it would be unwise for this Court to depart from long-settled precedent to apply an analysis that has not been developed or tested by the parties to the case. The Court accordingly will apply the same retroactivity framework in this case that it has applied to every previous collateral review case since *Teague* was decided.

## IV.

### A.

¶30 Before getting to the retroactivity of the rule Beach invokes, we must first establish that he, in fact, invokes a new rule. Beach argues that, under *Miller*, a sentencer must consider a juvenile's youth before sentencing that juvenile to life without parole. The State responds that *Miller* does not establish this rule. Instead, the State argues, *Miller* merely bars the mandatory imposition of a life without parole sentence on a juvenile. The State suggests that *Miller*'s language about required sentencing considerations is dicta.

¶31 Dictum is "[a]n opinion by a court . . . that is not essential to the decision and therefore not binding even if it may later be accorded some weight." *Black's Law Dictionary* 549 (Bryan A. Garner ed., 10th ed. 2009). *Miller*'s statements about required

17

sentencing considerations are not dicta. The *Miller* Court held that mandatory imposition of a life sentence is unconstitutional *because* a mandatory scheme prevents a sentencer from considering how a juvenile's youth affects the proportionality of that sentence, and the Eighth Amendment requires a sentencer to so consider. The Supreme Court could not have been clearer when it said, "Although we do not foreclose a sentencer's ability to [impose life without parole] in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469.

¶32     We think it clear that *Miller* establishes two rules. First, sentencing schemes that mandate life incarceration without the possibility of parole for juvenile offenders are unconstitutional. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469. Second, a sentencer must "follow a certain process" before imposing a life without parole sentence on a juvenile. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2471. Beach invokes the second rule.

¶33     Under the retroactivity framework, new rules are treated differently from old rules. *See Penry*, 492 U.S. at 319, 109 S. Ct. at 2947. An offender on collateral review generally cannot benefit from a new rule, whereas she can benefit from an old rule. *Teague*, 489 U.S. at 310, 109 S. Ct. at 1075. A rule is new unless dictated by precedent existing at the time the offender's conviction became final. *Teague*, 489 U.S. at 301, 109 S. Ct. at 1070.

¶34     Beach has omitted argument on this point, seemingly conceding the novelty of *Miller*'s sentencing consideration rule. Indeed, *Miller* rests on the twin recognitions that

18

(1) children are different for sentencing purposes, and (2) life sentences without the possibility of parole are similar to death sentences when imposed on juveniles. *See Miller*, 567 U.S. at ___, 132 S. Ct. at 2463-66. The Supreme Court did not fully recognize these principles until *Roper* in 2005 and *Graham* in 2010. Beach's conviction became final in 1985. Although the case law existing in 1985 may have foreshadowed *Miller*'s sentencing consideration rule, *see Eddings v. Oklahoma*, 455 U.S. 104, 115, 102 S. Ct. 869, 877 (1982), these cases certainly did not dictate or compel such a rule. We conclude that *Miller*'s sentencing consideration rule is a new rule, subject to the general rule of non-retroactivity on collateral review.

**B.**

¶35 A new rule is not retroactive on collateral review unless it is a substantive rule or a watershed procedural rule. *Teague*, 489 U.S. at 310-11, 109 S. Ct. at 1075-76. Since 2012, many state and lower federal courts have wrestled with *Miller*'s retroactivity. These courts appear to agree that *Miller* creates a new rule subject to the general rule of non-retroactivity. *See, e.g., In re Morgan*, 713 F.3d 1365, 1366-67 (11th Cir. 2013); *Diatchenko v. Dist. Atty. for Suffolk Dist.*, 466 Mass. 655, 667 (2013). The courts diverge, however, on whether *Miller* fits into one of the exceptions to the general rule. Courts that have held *Miller* retroactive generally conceive of *Miller* as creating a substantive rule. *See, e.g., Illinois v. Davis*, 6 N.E.3d 709, 722 (Ill. 2014); *Iowa v. Ragland*, 836 N.W.2d 107, 117 (Iowa 2013). By contrast, courts that have held *Miller* non-retroactive generally conceive of *Miller* as creating a procedural rule, but not a

watershed procedural rule. *See, e.g., Michigan v. Carp*, 496 Mich. 440, 495 (2014); *Pennsylvania v. Cunningham*, 81 A.3d 1, 26-29 (Pa. 2013).

¶36 Most of these courts have been concerned with whether *Miller*'s prohibition on mandatory life without parole sentences is retroactive.[8] *See, e.g., Davis*, 6 N.E.3d at 723; *Carp*, 496 Mich. at 483 n.13. *But see Aiken v. Byars*, 410 S.C. 534, 543-44 (2014). Because *Miller*'s mandatory sentencing rule has no application in Montana, the ensuing analysis does not concern—at least directly—the retroactivity of that rule. We focus instead on the retroactivity of *Miller*'s rule requiring consideration of a juvenile offender's youth before imposing a life without parole sentence.

¶37 Beach includes only one sentence in his brief suggesting that *Miller*'s sentencing consideration rule may represent a watershed procedural rule. Beach instead has focused his retroactivity argument on showing that the *Miller* rule is substantive. The strategy makes sense considering that the United States Supreme Court effectively has interpreted the watershed procedural rule exception as a "null set." R. Fallon, J. Manning, D. Meltzer, & D. Shapiro, *Hart and Wechsler's The Federal Courts and the Federal System* 1246 (6th ed. 2009); s*ee also Sepulveda v. United States*, 330 F.3d 55, 61 (1st Cir. 2003) (watershed procedural rules under the federal retroactivity framework are "hen's-teeth rare"). The Supreme Court continuously has equated the watershed procedural rule exception with *Gideon* and *Gideon* alone. In this context, we cannot say that *Miller*'s rule is a watershed procedural rule. Montana always has permitted a

---

[8] It stands to reason that jurisdictions that at one time mandated juvenile life without parole sentences have more offenders who stand to benefit from *Miller* and to litigate its retroactivity.

sentencer to consider a juvenile offender's youth when sentencing that offender to a term of years with no possibility of parole. *Miller*'s rule merely goes a step further by requiring that consideration. The rule's effect on the fairness and accuracy of a criminal proceeding is not on par with *Gideon*. Accordingly, *Miller*'s sentencing consideration rule is not a watershed procedural rule.

¶38 Justice Cotter agrees with Beach that *Miller* announced a new substantive rule. Dissent, ¶ 115. A substantive sentencing rule is a rule that "prohibit[s] a certain category of punishment for a class of defendants because of their status or offense." *Penry*, 492 U.S. at 330, 109 S. Ct. at 2953. In other words, a substantive sentencing rule is a "categorical guarantee[] accorded by the Constitution, regardless of the procedures followed," *Penry*, 492 U.S. at 329, 109 S. Ct. at 2952, that "place[s] particular conduct or persons covered by the statute beyond the state's power" to subject to a particular punishment, *Schriro*, 542 U.S. at 352, 124 S. Ct. at 2522-23. In *Miller*, the Supreme Court specifically stated that it did "*not categorically bar* a penalty for a class of offenders or type of crime," and instead mandated "only that a sentencer follow a *certain process* . . . before imposing" life without parole on a juvenile. *Miller*, 367 U.S. at ___, 132 S. Ct. at 2471 (emphases added). *Miller* did not hold that juvenile life without parole sentences are categorically unconstitutional. *Miller*, 367 U.S. at ___, 132 S. Ct. at 2469. *Miller* "dictated what process must take place before a life-without parole sentence could be imposed, [but] it did not prohibit a state from imposing that penalty on a certain class

21

of offenders." 7 W. Lafave, J. Israel, N. King, & O. Kerr, *Criminal Procedure* § 28.6(e) (3rd ed. 2007, 2014-2015 supplement).

¶39    Beach's own summary of *Miller* defeats his suggestion that *Miller* is substantive. "*Miller*," he explains, "prohibits a particular punishment (life-without-parole) for a class of defendants (juveniles) *unless* specific youth related factors are first considered." (Emphasis added.)    In other words, under *Miller*, a sentencing court retains the constitutional authority to sentence a juvenile to life without parole.  If Beach's case were remanded for sentencing, a sentencing judge, upon following *Miller*'s sentencing consideration rule, could resentence Beach to the exact same sentence he received before. This differs from a substantive rule.  For instance, regardless of the procedures followed, a sentencer after *Graham* could not resentence a juvenile non-homicide offender to life without parole; a sentencer after *Roper* could not resentence a juvenile to the death penalty; a sentencer after *Atkins* could not resentence an intellectually disabled offender to the death penalty; and a sentencer after *Kennedy* could not resentence a non-homicide offender to the death penalty.  Because *Miller*'s sentencing consideration rule "regulates only the manner of determining" a sentence by requiring a certain process, and does not alter the range of punishment that Beach could receive, *Schriro*, 542 U.S. at 353, 124 S. Ct. at 2523, it is procedural and not substantive.[9]

¶40    Beach seeks to forestall this conclusion by reframing the required considerations under *Miller* as "elements" of a life without parole sentence imposed on a juvenile.  The

_____

[9] Justice Wheat's Dissent appears to agree, Dissent, ¶ 54, and Justice Shea's Dissent does not appear to take issue with this analysis.

22

case on which Justice Cotter relies, Dissent ¶¶ 118-20, sounds a similar theme. *See In re Willover*, No. HO40757, 2015 Cal. App. LEXIS 322, *20-21 (stating that *Miller* created "a rule that sets forth the specific considerations to be made during a sentencing decision" of a juvenile homicide offender). An element is a certain fact that is essential to an offense or punishment. *See Alleyne v. United States*, 570 U.S. ___, ___, 133 S. Ct. 2151, 2155 (2013). By its terms, *Miller* requires only that a sentencer consider certain factors; it does not make the finding of "certain fact[s] essential" to a life without parole sentence. *Schriro*, 542 U.S. at 354, 124 S. Ct. at 2524.

¶41 The logical conclusion to Beach's elements argument is that any new rule that conditions the imposition of a particular sentence on a particular procedure would be considered substantive. But that does not comport with cases holding such rules to be procedural only. *See Beard v. Banks*, 542 U.S. 406, 420, 124 S. Ct. 2504, 2515 (2006) (finding non-retroactive a rule prohibiting imposition of the death penalty by jury unless the jury can consider all mitigating factors); *Schriro*, 542 U.S. at 354, 124 S. Ct. at 2524 (concluding that a rule prohibiting imposition of the death penalty unless elements of that sentence are found by a jury is procedural and not substantive); *Sawyer v. Smith*, 497 U.S. at 242, 110 S. Ct. at 2831 (finding non-substantive a rule that prohibits the imposition of the death penalty by a sentencer under the mistaken belief that responsibility for determining the propriety of the death penalty rests elsewhere). In all of these cases, just as in Beach's case, the examined rules did not "prohibit[ ] a certain category of punishment for a class of defendants because of their status or offense,"

23

*Penry*, 492 U.S. at 330, 109 S. Ct. at 2953—the rules instead prohibited a certain category of punishment *unless* the sentencer followed a prescribed process. This demonstrates a significant difference from the *Willover* case. The court in *Willover* determined that, "Because petitioner was sentenced at a time when the prevailing case law required a presumption of [life without parole], there is a 'significant risk' that petitioner 'faces a punishment that the law cannot impose upon him.'" *In re Willover*, 2015 Cal. App. LEXIS 322 at *21. No such presumption existed in Montana law at the time Beach was sentenced.

¶42 Finally, if the *Miller* considerations are elements of a life without parole sentence, Beach does not explain how his proposed solution to the constitutional infirmity of his sentence—resentencing by a judge who must consider these elements—is any more constitutional than his original sentence, considering that all elements necessary to raise the maximum allowable sentence for a crime must be found by a jury, not by a judge. *See Apprendi v. New Jersey*, 530 U.S. 466, 476, 120 S. Ct. 2348, 2355 (2000).

**C.**

¶43 Beach makes three more arguments, all of which may bear on the *Miller* rule's retroactivity in general, but do not bear directly on whether the *Miller* rule fits into one of the retroactivity framework's exceptions.

¶44 First, Beach notes that the companion case in *Miller* was *Jackson v. Hobbs*, an appeal by a prisoner on collateral review. Because Jackson benefitted from *Miller*, and

24

Beach is similarly situated to Jackson on collateral review, Beach argues that fairness dictates that he too should benefit from *Miller*'s rule.

¶45 Retroactivity, however, is an affirmative defense to be raised by the government. "[A] federal court may, but need not, decline to apply [the retroactivity framework] if the [s]tate does not argue it." *Caspari v. Bohlen*, 510 U.S. 383, 389, 114 S. Ct. 948, 953 (1994). Arkansas (the state responding to Jackson's petition for habeas corpus) did not argue to the Supreme Court that the rule Jackson sought was non-retroactive.[10] Given this omission, the Supreme Court did not examine or decide the retroactivity of the *Miller* rule. Arkansas's waiver of its retroactivity defense in Jackson's appeal does not mean that the Supreme Court determined that *Miller* is retroactive.

¶46 Second, Beach argues that *Miller* is retroactive because the cases upon which it relies are retroactive. Beach is correct that *Roper* and *Graham* are retroactive as substantive rules. *See, e.g., In re Sparks*, 658 F.3d 257, 262 (5th Cir. 2011) (concluding that *Graham* is substantive and retroactive); *Little v. Dretke*, 407 F. Supp. 2d 819, 823-24 (W.D. Tex. 2005) (concluding that *Roper* is substantive and retroactive). *Roper* and *Graham* are similar to *Kennedy* and *Atkins* in that they "categorically bar a penalty for a class of offenders or type of crime." *Miller*, 367 U.S. at ___, 132 S. Ct. at 2471. But *Miller* explicitly disclaimed creating a categorical bar to a type of punishment. *Miller*, 367 U.S. at ___, 132 S. Ct. at 2471. In its effect, *Miller* more closely resembles two of the other cases upon which it relied—*Woodson* and *Lockett*, which invalidated mandatory

---

[10] See Brief for Respondent, *Jackson v. Hobbs*, http://perma.cc/7bz4-vfyc (U.S. 2012) (No. 10-9647).

25

death penalty sentences and required individualized sentencing. *Lockett*, 438 U.S. at 604, 98 S. Ct. at 2964-65; *Woodson*, 428 U.S. at 303-05, 96 S. Ct. at 2991-92. Beach has not identified any cases holding that *Woodson* and *Lockett* qualify as retroactive under the current retroactivity framework.[11]

¶47   Third, Beach argues that it would be unjust to permit offenders on direct review to benefit from *Miller* but not to afford the same benefit to offenders on collateral review. In a case Beach cited as supplemental authority, and quoted in oral argument, the California Court of Appeal for the Second Judicial District made a similar point:

> We find particularly troubling the apparent inequity that would arise if the prospect of an individualized, discretionary judicial determination of whether a juvenile murderer should be afforded parole eligibility would depend solely upon the happenstance of the precise moment that the defendant's conviction became final. No court that has rejected the retroactive application of *Miller* has advanced a rationale to resolve this inequity.

*In re Wilson*, 233 Cal. App. 4th 544, 567 (2015). With this argument, the California court and Beach fail to recognize two things. First, *Miller*'s non-retroactivity is no more inequitable than the non-retroactivity of the rules in *Beard*, *Schriro*, or *Sawyer*, all of which similarly involved procedures meant to ensure the accuracy of sentences, yet

---

[11] Beach cites *Sumner v. Shuman*, 483 U.S. 66, 72, 107 S. Ct. 2716, 2727 (1987) (invalidating a statute mandating a death sentence for a prisoner who kills someone while serving a life sentence), as an example of an instance when *Woodson* and *Lockett* were applied retroactively on collateral review. But *Sumner* does not address retroactivity under the current framework; indeed, *Sumner* does not appear to address a retroactivity argument at all. Moreover, *Woodson* was announced before Sumner's conviction became final, meaning *Woodson* was not applied retroactively in *Sumner*. Beach also cites *Campbell v. Blodgett*, 978 F.2d 1502 (9th Cir. 1992), *Thigpen v. Thigpen*, 926 F.2d 1003 (11th Cir. 1991), and *McDougall v. Dixon*, 921 F.2d 518 (4th Cir. 1990), to show *Sumner*'s retroactive application, but none of these cases appear to address *Sumner*'s retroactivity.

involved the harshest of punishments—the death penalty. Second, the concept of equity between offenders on direct and collateral review does not stand in a vacuum. For instance, Justice Wheat's protest that it is unfair to not apply *Miller* by virtue of the "mere[]" timing of Beach's conviction, Dissent, ¶ 73, ignores the unfairness of re-opening this case after a "mere" thirty years have passed without closure for the victim's family. The law strikes a balance between the interests of equity among offenders and finality of convictions. That balance is embodied in the principles of retroactivity that we have applied in our prior cases and that we apply again today.

## CONCLUSION

¶48 Because the *Miller* sentencing consideration rule is new and is neither a substantive rule nor a watershed procedural rule, we conclude that it is not retroactive to Beach's claim on collateral review. Retroactivity is a threshold issue, *Teague*, 489 U.S. at 300, 109 S. Ct. at 1070, and Beach does not pass the threshold. Accordingly, we do not reach the merits in this case.

## ORDER

¶49 The petition for writ of habeas corpus is denied.

DATED this 5th day of May, 2015.

/S/ BETH BAKER

We concur:

/S/ JIM RICE
/S/ JAMES B. WHEELIS, District Judge
sitting in place of Chief Justice Mike McGrath

Justice Laurie McKinnon, specially concurring.

¶50 Beach asks this Court, once again, to ignore the important public interest in ensuring the finality of state court judgments and to conclude that, no matter how many years have passed since a petitioner's conviction has become final, if he can scrape together enough developments in the law over thirty years, perhaps he might receive a better outcome at a new sentencing. *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455, 2469 (2012), does not hold that life without parole sentences for juveniles are categorically unconstitutional and can never be imposed. Opinion, ¶ 10. Beach concedes that the holding of *Miller* does not apply to his case. Opinion, ¶ 11. Nevertheless, we go forward with an extensive retroactivity analysis of *Miller* after finding that consideration of youth at sentencing is a "new" procedural rule, Opinion, ¶ 34, though one that we ultimately conclude need not be applied retroactively, Opinion, ¶ 48. We do this in the context of Montana's discretionary sentencing scheme, which specifically requires the sentencing judge to consider the individual characteristics, needs, circumstances, and potentialities of the person being sentenced.[1] Montana has always required a judge to consider the individual characteristics of an offender—including age—in imposing a

---

[1] At the time Judge Sorte sentenced Beach, the sentencing policy reflected in § 46-18-101, MCA (1978), provided:

> This chapter shall be liberally construed to the end that persons convicted of a crime shall be dealt with in accordance with their individual characteristics, circumstances, needs and potentialities; that dangerous offenders shall be correctively treated in custody for long terms as need; and that other offenders shall be dealt with by probation, suspended sentence, or fine whenever such disposition appears practicable and not detrimental to the needs of public safety and the welfare of the individual.

sentence. There is nothing new about the rationale that juvenile offenders are less culpable than adult offenders, nor does the application of this rationale constitute a new rule in Montana. The significance of this rationale is to demonstrate that states with sentencing schemes *mandating* life without parole for juveniles violate the Eighth and Fourteenth Amendments, because such mandates fails to consider the youth of the offender. Given our individualized and discretionary sentencing statutes and the obligations they already impose upon a judge to consider a person's potential, needs, and individual characteristics, I am not sure of the value of a so-called new procedural rule requiring a judge to "'follow a certain process,'" Opinion, ¶ 32 (quoting *Miller*, 567 U.S. at ___, 132 S. Ct. at 2471), when that process is, in fact, already followed in Montana. In my opinion, Beach has failed to meet his burden of proving that Montana's sentencing scheme is not consistent with the requirements of *Miller*.

¶51 The habeas corpus statute reflects a narrow scope of relief which, though equitable in nature, is an extraordinary remedy. *Lott v. State*, 2006 MT 279, ¶¶ 20-21, 334 Mont. 270, 150 P.3d 337. The writ is "not available to attack the validity of the conviction or sentence of a person who has been adjudged guilty of an offense in a court of record and has exhausted the remedy of appeal." Section 46-22-101(2), MCA. We apply these principles routinely to other petitioners, and they should be applied equally to Beach. Beach received a facially valid sentence: Judge Sorte imposed a lawful sentence for Beach's conviction of deliberate homicide after considering a PSI that not only specified Beach's age, but set forth his juvenile history, family background, relationships, religion,

29

and any other relevant information for sentencing. Judge Sorte had full discretion in sentencing Beach, including the ability to find a statutory exception to the mandatory minimum based on Beach's age. *See* § 46-18-222(1), MCA (1978). Unlike the fourteen-year-old defendants in *Miller*, 567 U.S. at ___, 132 S. Ct. at 2460, Beach was a few months shy of eighteen when he committed this offense, an adult when he confessed to law enforcement, an adult during his trial for homicide, and an adult when he was sentenced.

¶52    I cannot state my opinion more clearly and forcefully than the State, when it writes:

> Ted Nees's letter eloquently expresses the anguish of Kim Nees's family. The Nees family clearly thought their tragic entanglement with Beach ended back in 1984. Yet, Beach repeatedly manages to be the beneficiary of hearings and procedures that no other convicted criminal is allowed. Beach is entitled to nothing more.

/S/ LAURIE McKINNON

Justice Michael E Wheat, dissenting.

¶53    I agree with much of the plurality opinion, and I specifically join Section I of that opinion. In this case, however, I would depart from the nonretroactivity rule of *Teague v. Lane*, 489 U.S. 288, 109 S. Ct. 1060 (1989), as applied by this Court in the line of cases beginning with *State v. Egelhoff*, 272 Mont. 114, 900 P.2d 260 (1995).[1] The rationale of

---

[1] The plurality implies that we cannot consider whether to depart from this retroactivity framework because Beach did not argue that we should do so. However, we have addressed arguments and even issues not raised or supported by parties where failing to do so would cause substantial injustice. *State v. Andersen-Conway*, 2007 MT 281, ¶ 14, 339 Mont. 439, 171 P.3d

those cases does not justify nonretroactivity in this case, and I would retroactively give Beach the benefit of the U.S. Supreme Court's decision in *Miller v. Alabama*, ___ U.S. ___, 132 S. Ct. 2455 (2012). In light of that decision, I would find Beach's sentence to be unconstitutional and grant his petition for a writ of habeas corpus. For these reasons, I concur in Section I and dissent from the rest of the plurality's opinion and its order.

## I. Retroactivity

¶54    I agree with the plurality that the retroactivity rule of *Teague* would preclude Beach from receiving the benefit of the procedural rule announced in *Miller*. We are not, however, limited by the retroactivity rule of *Teague* in state collateral review proceedings, and we are free to provide broader retroactive application of new rules than advocated by the *Teague* plurality. Opinion, ¶ 23 n.6; *see also Danforth v. Minnesota*, 552 U.S. 264, 275, 277, 128 S. Ct. 1029, 1038-39 (2008) ("Neither *Linkletter* nor *Teague* explicitly or implicitly constrained the authority of the States to provide remedies for a broader range of constitutional violations than are redressable on federal habeas. . . . A close reading of the *Teague* opinion makes clear that the rule it established was tailored to the unique context of federal habeas and therefore had no bearing on whether States could provide broader relief in their own postconviction proceedings than required by that opinion."). Although we have applied the nonretroactivity rule of *Teague* to state collateral review proceedings since first considering it in *Egelhoff*, I would depart from

---

678. Given the importance of the constitutional issues at stake and the potential for substantial injustice resulting from an incorrect decision, we are not required to resolve the issues raised by the parties based on their reasoning alone.

that rule here. Considering the rationale and the interests upon which the nonretroactivity rule of *Teague* is based,[2] the interests at stake in the rule announced in *Miller*, and the value this Court and the people of Montana place on those interests, I would retroactively give Beach the benefit of the rule announced in *Miller*.

1. *The rationale for the nonretroactivity rule of* Teague

¶55 A plurality of the Supreme Court adopted a new rule governing retroactivity in *Teague*.[3] 489 U.S. at 305, 310, 109 S. Ct. at 1072-73, 1075. The general rule of nonretroactivity it adopted was an exercise of the U.S. Supreme Court's power to interpret the federal habeas corpus statute. *Danforth*, 552 U.S. at 278, 128 S. Ct. at 1039-40. The purposes for the federal writ of habeas corpus provided the "relevant frame of reference," and the resulting nonretroactivity rule was "tailored to the unique context of federal habeas." *Danforth*, 552 U.S. at 277, 279, 128 S. Ct. at 1039-40; *Teague*, 489 U.S. at 306, 109 S. Ct. at 1073.

¶56 The plurality recognized two primary purposes for the writ. The first purpose, deterrence, provided the foundation for the general nonretroactivity rule. The plurality stated that "the threat of habeas serves as a necessary . . . incentive for trial and appellate courts throughout the land to conduct their proceedings in a manner consistent with established constitutional standards." *Teague*, 489 U.S. at 306, 109 S. Ct. at 1073. In

---

[2] This Court has never provided reasoning for adopting the retroactivity rule of *Teague*. *See, e.g., State v. Cook*, 2012 MT 34, ¶¶ 17-19, 364 Mont. 161, 272 P.3d 50; *State v. Reichmand*, 2010 MT 228, ¶¶ 13-15, 358 Mont. 68, 243 P.3d 423; *Egelhoff*, 272 Mont. at 126, 900 P.2d at 267.

[3] The rule was adopted by a majority of the U.S. Supreme Court in *Penry v. Lynaugh*, 492 U.S. 302, 313-14, 109 S. Ct. 2934, 2944 (1989).

order to perform this deterrence purpose, the plurality reasoned, rules need not be applied retroactively. Instead, "the habeas court need only apply the constitutional standards that prevailed at the time the original proceedings took place." *Teague*, 489 U.S. at 306, 109 S. Ct. at 1073.

¶57 Having decided that nonretroactivity was consistent with purposes of habeas corpus, the plurality considered the interests of comity and finality to better define the scope of review. It decided that nonretroactivity of new rules is preferred. *Teague*, 489 U.S. at 307-08, 109 S. Ct. at 1073-75. The interest of finality is the interest in reducing a controversy to a final judgment not subject to further judicial revision. *Teague*, 489 U.S. at 306, 109 S. Ct. at 1073. This interest, of course, weighed in favor of nonretroactivity. The plurality considered the interest to be important, because "[w]ithout finality," it said, "the criminal law is deprived of much of its deterrent effect." *Teague*, 489 U.S. at 309, 109 S. Ct. at 1074. The interest of comity also weighed in favor of nonretroactivity. The plurality reasoned that "the application of new rules to cases on collateral review . . . continually forces the States to marshal resources in order to keep in prison defendants whose trials and appeals conformed to then-existing constitutional standards." *Teague*, 489 U.S. at 310, 109 S. Ct. at 1075. It decided that the "costs imposed upon the State[s] by retroactive application of new rules of constitutional law on habeas corpus . . . generally far outweigh the benefits of this application." *Teague*, 489 U.S. at 310, 109 S. Ct. at 1075 (quoting *Solem v. Stumes*, 465 U.S. 638, 654, 104 S. Ct. 1338, 1347 (1984) (Powell, J., concurring)) (modifications in original). Based on the deterrence purpose of

habeas corpus and the scope of review dictated by comity and finality, the plurality concluded that a general rule of nonretroactivity was appropriate for federal habeas corpus review. *Teague*, 489 U.S. at 310, 109 S. Ct. at 1075.

¶58 The limited exceptions the plurality recognized to this rule were based on a second purpose for federal habeas corpus, namely "to assure that no man has been incarcerated under a procedure which creates an impermissibly large risk that the innocent will be convicted." *Teague*, 489 U.S. at 312, 109 S. Ct. at 1076. This was a relatively slight consideration for the plurality, however, as "[t]he Court has never defined the scope of the writ simply by reference to a perceived need to assure that an individual accused of crime is afforded a trial free of constitutional error." *Teague*, 489 U.S. at 308, 109 S. Ct. at 1074. The plurality, therefore, drew the exceptions to the nonretroactivity rule narrowly, concluding that only where the *fundamental* fairness of a proceeding was implicated or where "*bedrock procedural elements* . . . vitiate the fairness of a particular conviction," would there be an impermissibly large risk of unfairness requiring retroactive application of a new rule. *Teague*, 489 U.S. at 311, 109 S. Ct. at 1076 (emphasis in original). Such cases, the plurality declared, would be few and far between. *See Teague*, 489 U.S. at 311, 109 S. Ct. at 1076.

¶59 In crafting its rule, the plurality ultimately concluded that while fairness weighed in favor of retroactive application of new rules, it was a relatively slight consideration and was generally outweighed in the context of federal habeas review by considerations

34

of finality, comity, and the writ's deterrence purpose. *Teague*, 489 U.S. at 306, 309-10, 109 S. Ct. at 1073-75.

*2. The rationale of* Teague *does not justify nonretroactivity in this case*

¶60 Balancing these same interests in the context of this case and the Montana writ of habeas corpus, I would depart from the rule of *Teague*. Nonretroactive application of *Miller* will lead to unfair results, and unlike in *Teague*, the relevant countervailing interests are not sufficient to justify such results in this case. More specifically, our writ serves a different purpose than the federal writ, and, in this context and considering the rule we are asked to apply, fairness outweighs considerations of comity and finality. Therefore, the rationale of the *Teague* plurality does not justify application of its nonretroactivity rule in this case, and we should give Beach the benefit of *Miller*.

*a. The purposes for our writ of habeas corpus*

¶61 We have recognized that "Montana's guarantee of the privilege of habeas corpus embodies a fundamental, intrinsic principle: the right to challenge the cause of one's imprisonment." *Lott v. State*, 2006 MT 279, ¶ 7, 334 Mont. 270, 150 P.3d 337. Rather than a mere deterrent, the writ is the "birthright of the people" and "one of the most important safeguards of the liberty of the subject." *Lott*, ¶ 6. Indeed, our Constitution guards the writ more completely than the Federal Constitution. *Compare* Mont. Const. art. II, § 19 *with* U.S. Const. art. I, § 9. Rather than primarily a deterrent to the courts, the writ in Montana is a tool for achieving justice. *See* Order, *Paranteau v. Green* 6-7, No. OP 13-0769 (Mar. 4, 2014); *Lott*, ¶¶ 7, 9, 20. Thus, I cannot say, as the *Teague* plurality

35

did, that the primary purpose of the writ can readily be served in all cases by merely "apply[ing] the constitutional standards that prevailed at the time the original proceedings took place." *Teague*, 489 U.S. at 306, 109 S. Ct. at 1073.

### b. *Comity does not affect this decision*

¶62 Interests of comity played a central role in how the *Teague* plurality reached its rule. *Danforth*, 552 U.S. at 279-80, 128 S. Ct. at 1040-41; *Teague*, 489 U.S. at 308-10, 109 S. Ct. at 1074-75. Comity is generally of no concern in state collateral review proceedings. *Danforth*, 552 U.S. at 279-80, 128 S. Ct. at 1041. Except in limited circumstances, this is so in Montana, and this is the case today. The Court's decision here will not disrupt the proceedings of any other sovereign, and for that reason comity does not weigh against retroactive application of *Miller*. If anything, comity instead weighs in *favor* of retroactive application. *See Danforth*, 552 U.S. at 279-80, 128 S. Ct. at 1041 ("[C]onsiderations of comity militate in favor of allowing state courts to grant habeas relief to a broader class of individuals than is required by *Teague*."); *Kills on Top v. State*, 279 Mont. 384, 420, 928 P.2d 182, 204 (1996) ("[C]onsiderations of federalism and comity counsel respect for the ability of state courts to carry out their role as the primary protectors of the rights of criminal defendants.").

### c. *Finality carries less weight here than it did in* Teague

¶63 As in *Teague*, interests of finality do weigh against retroactive application of *Miller*, but we need not give finality the same weight as the *Teague* plurality. The Supreme Court has stated, "finality of state convictions is a *state* interest, not a federal

36

one.  It is a matter that States should be free to evaluate, and weigh the importance of, when prisoners held in state custody are seeking a remedy for a violation of federal rights by their lower courts."  *Danforth*, 552 U.S. at 279-80, 128 S. Ct. at 1041 (emphasis in original).  I would afford finality less weight than the *Teague* plurality in today's decision.

¶64    While I agree with the *Teague* plurality that finality is important to conservation of State resources, *Teague*, 489 U.S. at 310, 109 S. Ct. at 1075, the plurality only considered the effect on State resources from overturning a conviction.  Here, Beach does not contest his guilt nor does he ask for a new trial.  Rather, he merely asks to be resentenced.  While allowing such relief does impose a burden on the State, it does not impose nearly the same burden that overturning a conviction and requiring a new trial would.  For this reason, the importance of finality does not weigh as heavily here as it did in *Teague* or as it would in many state collateral review proceedings.

¶65    I also agree with the *Teague* plurality that "[w]ithout finality, the criminal law is deprived of much of its deterrent effect."  *Teague*, 489 U.S. at 309, 109 S. Ct. at 1074.  However, finality is less important to preserving the deterrent effect in this case than it was in *Teague*.  The deterrent effect of criminal law is at the heart of the rule that we are asked to apply.  In *Miller*, *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011 (2010), and *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183 (2005), the U.S. Supreme Court recognized that juvenile offenders are less deterred by criminal sentences than adult offenders.  It is partly for this reason that it prohibited certain sentences and required

37

individualized consideration to support others.[4]  *Miller*, 132 S. Ct. at 2465; *Graham*, 560 U.S. at 72, 130 S. Ct. at 2028-29; *Roper*, 543 U.S. at 571-73, 125 S. Ct. at 1196-97. Here, we cannot say that retroactive application will harm the deterrent effect of the law, because we cannot say that the law was ever a deterrent to Beach or to similarly situated individuals.  *Miller*, 132 S. Ct. at 2465, 2469.  At the very least, it served as less of a deterrent than it would in most cases.  Correspondingly, there is less harm from depriving the law of its deterrent effect in this case, and finality carries less weight than it did in *Teague*.

### d.  Nonretroactive application of Miller is unfair

¶66     The countervailing interest of fairness is of more importance here than it was in *Teague*, given the purposes for our state writ, as discussed above.  This heightened interest of fairness weighs in favor of retroactivity here, because nontretroactive application of *Miller* creates unfair results.  This is clear upon examination of the rule we are asked to apply and, based on that rule, the unfair distinctions the plurality draws in its decision.

### i.  The rule of Miller

¶67     We are asked to apply the rule of *Miller* in this case.  *Miller* is the latest decision in a line of cases that includes *Roper* and *Graham*, and its rule can only be fully

---

[4] See Part I.2.d.i., below for a more complete discussion of these cases.

understood in the context of those cases.[5]  *Miller*, 132 S. Ct. at 2463-69.  These cases stand for the rule that the Eighth Amendment prevents any criminal punishment that lacks a legitimate penological justification, and that to determine whether there is such justification, courts must take into account the characteristics attendant to juvenility that, for example, make juvenile convicts less culpable and more reformable.

¶68    In *Roper*, the U.S. Supreme Court decided that the Eighth Amendment prohibits states from imposing the death penalty on juvenile offenders.  543 U.S. at 568, 125 S. Ct. at 1194.  It explained that when compared to adults, juveniles are less mature, less responsible, more vulnerable to negative influences and outside pressures, and more likely to be rehabilitated.  *Roper*, 543 U.S. at 569-70, 125 S. Ct. at 1195-96.  These differences, the court decided, render juvenile offenders less culpable for their crimes than adults.  *Roper*, 543 U.S. at 571, 125 S. Ct. at 1196.  Based on this diminished culpability and lack of maturity, the court reasoned that the penological purposes for the death penalty – retribution and deterrence – apply with less force to juveniles than adults.  Ultimately, it decided that "neither retribution nor deterrence provides adequate justification for imposing the death penalty on juvenile offenders," and that the death penalty is a disproportionate punishment when applied to juveniles.  *Roper*, 543 U.S. at 572, 125 S. Ct. at 1196.  Because the Eighth Amendment requires punishments to be proportionate to the crime and culpability of an offender, the court decided that

---

[5] For the sake of convenience, we have and will continue to refer to the rule we are asked to apply as the rule of *Miller*.  The rule might more accurately, however, be referred to as the rule expressed in *Miller* in light of *Graham* and *Roper*.

sentencing juveniles to death violates the Eighth Amendment. *Roper*, 543 U.S. at 568, 125 S. Ct. at 1194.

¶69 Applying much the same analysis, the U.S. Supreme Court decided in *Graham* that the Eighth Amendment prohibits imposing life sentences without the possibility of parole on juveniles that have not committed homicide. *Graham*, 560 U.S. at 74, 130 S. Ct. at 2029-30. It again analyzed the penological purposes for the sentence and decided that, given the differences in maturity and culpability of a juvenile, the penological purposes do not justify imposing such a sentence on juveniles. *Graham*, 560 U.S. at 67-74, 130 S. Ct. at 2026-30. In particular, it recognized that imposition of a sentence of life without parole is an implicit decision that a juvenile is incorrigible and will forever be a danger to society. *Graham*, 560 U.S. at 74, 130 S. Ct. at 2029-30. The penalty, it said, "forswears altogether the rehabilitative ideal," since it "deprives the convict of the most basic liberties without giving hope of restoration." *Graham*, 560 U.S. at 69-70, 74, 130 S. Ct. at 2027, 2030. This kind of irrevocable judgment that denies an offender the right to reenter society, it reasoned, is not appropriate in light of juveniles' "capacity for change and limited moral culpability." *Graham*, 560 U.S. at 74, 130 S. Ct. at 2030.

¶70 The U.S. Supreme Court again applied this general analytical framework in *Miller*. The decision in that case differed from *Roper* and *Graham* in that it did not categorically prohibit a type of punishment for a class of individuals. *Miller*, 132 S. Ct. at 2471. The court relied on those cases' analyses, however, and decided that, based on the

40

characteristics attendant to juvenility, a sentence of life imprisonment without parole imposed on a juvenile homicide offender will usually not have legitimate penological justifications. *Miller*, 132 S. Ct. at 2469. It decided, though, that it might be justified for particular juveniles, based on their particular characteristics. *Miller*, 132 S. Ct. at 2469. It, therefore, required sentencing courts, as a condition to the constitutionality of a life without parole sentence imposed on a juvenile homicide offender, to consider the penological justifications for the sentence in light of the offender's juvenility and attendant capacity for rehabilitation and diminished culpability. *Miller*, 132 S. Ct. at 2469.

¶71     This line of cases stands for the proposition that the Eighth Amendment prevents any criminal punishment that lacks legitimate penological justification, and that to determine whether there is such justification, courts must take into account the characteristics attendant to juvenility that make juvenile offenders less culpable and more likely to be reformed. For some sentences, such as the death penalty and life sentences without parole for non-homicide offenders, there will never be legitimate penological justifications for imposing the sentence on juveniles. *Graham*, 560 U.S. at 74, 130 S. Ct. at 2030; *Roper*, 543 U.S. at 568, 125 S. Ct. at 1194. For other sentences, such as life sentences without parole for homicide offenders, there may but usually will not be legitimate penological justifications. To conform to the Eighth Amendment in such circumstances, sentencing courts must consider the characteristics of the particular juvenile offender. *Miller*, 132 S. Ct. at 2469.

## ii. The effect of the plurality's decision not to apply Miller retroactively

¶72 The plurality, by choosing not to apply the rule of *Miller* retroactively, implicitly makes several fine and unfair distinctions between similarly situated offenders, and it decides that constitutional protections can legitimately be extended or withheld upon these distinctions alone.

¶73 If a sentence identical to Beach's was imposed today on an offender identical to Beach, the Court should have no trouble disposing of the threshold retroactivity issue and considering whether the sentence is unconstitutional. *See* Opinion, ¶¶ 12, 48; *Miller*, 132 S. Ct. at 2469. Yet, according to the plurality, that same question of constitutionality cannot be reached now merely because of the timing of Beach's conviction and sentencing. This aspect of the plurality's decision draws two distinctions.

¶74 First, the plurality decides that there is a difference between the sentences that this society can constitutionally impose and the sentences this society can constitutionally enforce. If Beach's sentence does not comply with *Miller*, then this society could not impose the same sentence on him today. The plurality decides, though, that we can continue to enforce the same sentence we now recognize as unconstitutional. This is illogical, especially since a sentence to life without parole is a judgment by a court that an offender will never be fit to reenter society. *Miller*, 132 S. Ct. at 2469; *Graham*, 560 U.S. at 74, 130 S. Ct. at 2030. If we now recognize that a certain type of offender may be able to reenter our society, we should not prevent the offender from doing so based merely on the values of the past society that sentenced him or her.

42

¶75 The second distinction this aspect of the plurality's decision draws is between offenders based purely upon when the offender appears in court. It decides that a mere 60 days – the time for filing an appeal to this Court, after which postconviction proceedings are the only means of relief – will mean the difference between an offender receiving constitutional protection or not. *See* M. R. App. P. 4(5)(b). As we have stated, "selectively applying the Constitution to people who are similarly situated based merely on the circumstances or timing of their appearance in court is the antithesis of the judiciary's responsibility." *State v. Whitehorn*, 2002 MT 54, ¶ 41, 309 Mont. 63, 50 P.3d 121. The rule of *Miller* is unquestionably of constitutional importance, and the plurality decides today to selectively apply it to otherwise similarly situated persons based solely on the timing of the offender's appearance in court.

¶76 Another aspect of the plurality's decision draws a third unfair distinction, distinguishing and treating disparately those sentences that are on their face penologically unjustified from those that lack penological justification based upon more individualized circumstances. While this is not a distinction the plurality explicitly makes, it is the practical effect of its opinion. As discussed above, the U.S. Supreme Court decided in *Graham* and *Roper* that death sentences and life without parole for non-homicide offenders would never have legitimate penological justifications when imposed on juveniles. *Graham*, 560 U.S. at 74, 130 S. Ct. at 2030; *Roper*, 543 U.S. at 568, 125 S. Ct. at 1194. The Court would have no trouble applying this rule retroactively, as it is a categorical prohibition. *See* Opinion, ¶¶ 38-39.

43

¶77 Illogically, however, the plurality refuses to apply the virtually indistinguishable rule of *Miller*. The real distinction between *Miller* and *Roper* or *Graham* is that the court in *Miller* decided that certain sentences are *usually* penologically unjustified rather than categorically prohibited. *Miller*, 132 S. Ct. at 2469. Because the sentence was not always prohibited, the Supreme Court allowed it under *Miller* based on the individual circumstances of the particular offender. *Miller*, 132 S. Ct. at 2469. Here, if Beach's sentence is equivalent to a sentence of life without parole and if the proper procedures were not followed in imposing it,[6] his sentence probably lacks penological justification and is unconstitutional. We would have no way of definitively knowing whether it is justified since an individualized determination was not made. By not applying Miller retroactively, the plurality implicitly decides that we need not ensure that Beach's sentence was proportional and constitutional merely because, regardless of Beach's own circumstances and despite the severe risk that the sentence will be unconstitutional, the type of sentence might occasionally be constitutionally applied to juveniles. *See* Opinion, ¶¶ 38-39; *Miller*, 132 S. Ct. at 2469.

¶78 Thus, the plurality's decision distinguishes between sentences that we can decide are unconstitutional based only on the sentence and bare demographic facts of the offender and those that we can tell are unconstitutional only after individualized consideration. This is unfair. A sentence that lacks penological justification is disproportionate and violates the Eighth Amendment regardless of the analysis required

---

[6] These questions are resolved below, in Part II.

44

to reach that conclusion. To extend and withhold the protections of the Eighth Amendment based on how closely we must examine the circumstances is an untenable and unfair basis for Constitutional protections.

*e. Finality does not justify nonretroactivity in this case*

¶79 The plurality's decision results in an unfair distinction. Given the level of importance we give fairness and remediation in Montana habeas corpus proceedings, only a strong countervailing interest could justify nonretroactive application of *Miller*. As discussed above, the only countervailing interest in this case is finality, and it is of slight importance here. It is not sufficient to justify nonretroactivity in spite of the resulting unfair consequences.

¶80 Unlike the U.S. Supreme Court, this Court serves as "the primary protector[] of the rights of criminal defendants." *Kills on Top*, 279 Mont. at 420, 928 P.2d at 204 (quoting *Cabana v. Bullock*, 474 U.S. 376, 391, 106 S. Ct. 689, 699 (1986)). Accordingly, when analyzing Eighth Amendment protections, we have stated that "[c]onventional notions of finality of litigation have no place where life or liberty is at stake and infringement of constitutional rights is alleged." *Kills on Top*, 279 Mont. at 400, 928 P.2d at 192 (holding that res judicata does not bar reconsideration of the constitutionality of a petitioner's death sentence during postconviction relief proceedings); *see also State v. Southwick*, 2007 MT 257, ¶ 16, 339 Mont. 281, 169 P.3d 698 (holding that res judicata does not prevent this Court from correcting a facially illegal sentence). While this statement taken alone may be overbroad and while the relevant

45

cases may be distinguishable from the present situation on their facts, the general principle is meritorious; this State, its people, and this Court place more value on fairness than finality, at least in the context of the Eighth Amendment. At the very least, where the interests bear comparable importance in a particular matter, finality should give way to fairness. As discussed above, this principle comports with the purposes for Montana's writ of habeas corpus.

¶81 The plurality's decision to adhere to *Teague* today turns this preference on its head. Here, fairness and the remedial purpose of our writ of habeas corpus are weighty compared to the relatively less important interest of finality. For this reason, and considering how we have weighed these interests in the past, finality and nonretroactivity should give way to fairness and retroactive application of *Miller*.

## II. Beach

¶82 The State argues that we should not grant Beach's petition for habeas corpus, even if *Miller* is applied retroactively. It contends that Beach's sentence was not unconstitutional under the rule of *Miller* because *Miller* only applies to sentences of life without parole that were mandatorily imposed by statute. The State concludes that Beach's sentence is not unconstitutional because it was neither mandatorily imposed nor a sentence of life without parole. Additionally, it argues, the sentencing court did, in fact, consider Beach's age when sentencing him. For this reason, it again concludes that Beach's sentence was not unconstitutional under the rule of *Miller*. I disagree.

¶83    While applied in that case to a mandatory sentence of life without parole, the court in *Miller* was concerned with the "irrevocable judgment about [an offender's] value and place in society" that kind of sentence makes. *Miller*, 132 S. Ct. at 2465 (quoting *Graham*, 560 U.S. at 74, 130 S. Ct. at 2030) (alteration in original). Life without parole, it said, "forswears altogether the rehabilitative ideal," deciding that the offender is "incorrigible." *Miller*, 132 S. Ct. at 2465 (quoting *Graham*, 560 U.S. at 73-74, 130 S. Ct. at 2029-30). Because "incorrigibility is inconsistent with youth" and juveniles are thus often more reformable than adults, the court concluded that the sentence would not always be penologically justified and therefore could not be mandatorily imposed. *Miller*, 132 S. Ct. at 2465, 2468-69. It stated that the sentence might still be constitutionally imposed on juveniles, but only after individualized consideration of that juvenile's characteristics. *Miller*, 132 S. Ct. at 2469.

¶84    Here, the court's decision applies with the same force to Beach's sentence. Because he was sentenced on May 11, 1984, to 100 years' imprisonment without the possibility of parole, the earliest Beach could have been released was when he was 72 years old. This means that his sentence exceeded his life expectancy at the time of sentencing, and that it is near or in excess of his life expectancy now. *See* IIA National Center for Health Statistics, *Vital Statistics of the United States* § 6, 577 (U.S. Department of Health and Human Services 1984) (reporting the life expectancy at birth for a white male born in 1961 as 67.55 years, and reporting the expectation of life at twenty years old for a white male born in 1961 as 50.25 years); National Center for

47

Health Statistics, *United States Life Tables, 2010*, National Vital Statistics Reports, Nov. 6, 2014, at 3 (reporting that in 2010 the expectation of life for a 40 year old white male was 38.5 years). Thus, the sentence provided Beach with no meaningful opportunity for release and no "meaningful opportunity" to demonstrate the "maturity and rehabilitation" sufficient to reenter society. *Graham*, 560 U.S. at 75, 130 S. Ct. at 2011. As in *Miller*, the sentence imposed upon Beach forswears the rehabilitative ideal based upon the implicit decision that Beach, even as a juvenile, was incorrigible. As in *Miller*, the sentence deprived him of the most basic liberties without giving hope of restoration. *Miller*, 132 S. Ct. at 2465; *see Graham*, 560 U.S. at 69-70, 130 S. Ct. at 2027. Thus, for the purposes of *Miller*, Beach's sentence is the functional equivalent of life without parole. *Cf. Lockyer v. Andrade*, 538 U.S. 63, 79, 123 S. Ct. 1166, 1176-77 (2003) (Souter, J., dissenting) ("because Andrade was 37 years old when sentenced, the substantial 50-year period amounts to life without parole"); *Graham*, 560 U.S. at 70-71, 130 S. Ct. at 2028 (citing *Harmelin v. Michigan*, 501 U.S. 957, 996, 111 S. Ct. 2680, 2702 (1991) ("In some cases . . . there will be negligible difference between life without parole and other sentences of imprisonment – for example, . . . a lengthy term sentence without eligibility for parole, given to a 65-year-old man."); *Sumner v. Shuman*, 483 U.S. 66, 83, 107 S. Ct. 2716, 2726 (1987) ("[T]here is no basis for distinguishing, for the purposes of deterrence, between an inmate serving a life sentence without the possibility of parole and a person serving several sentences of a number of years, the total of which exceeds his normal life expectancy."). According to *Miller*, then, Beach's sentence could

only be constitutionally imposed if the sentencing court considered whether the sentence was penologically justified in light of Beach's juvenility. *Miller*, 132 S. Ct. at 2469.

¶85 It is of little importance that Beach's chronological age was on the PSI and available to the sentencing judge. In order to constitutionally impose Beach's sentence, it would not have been enough for the sentencing judge to be aware of Beach's chronological age. Knowing that Beach was a juvenile, the court would still need to consider Beach's particular circumstances and characteristics and to determine whether, in light of these characteristics, his culpability and inability to be reformed warrant the severe sentence. *Miller*, 132 S. Ct. at 2469.

¶86 Here, there is no indication in the record or otherwise that the District Court made these considerations. It issued a sentence that effectively decided that Beach was incorrigible without considering that as a juvenile he was more likely to be reformed. It effectively sentenced him to life imprisonment without parole, and it did so without considering that as a juvenile Beach may have been more susceptible to outside pressure, less cognizant of consequences, and correspondingly less culpable and less likely to be deterred. *Miller*, 132 S. Ct. at 2465-69. In doing so, it made "youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence" and created "too great a risk of disproportionate punishment." *Miller*, 132 S. Ct. at 2469.

¶87 For these reasons, Beach's sentence does not comply with the rule announced in *Miller*. It is, therefore, unconstitutional. I would grant Beach's petition for this reason and I would order that he be resentenced.

49

Justice James Jeremiah Shea, dissenting.

¶88    I respectfully dissent from the plurality's opinion.  I write separately to note that we appear to be adopting the federal retroactivity framework in this case and to express my reservations about doing so.   This decision marks the first time we have acknowledged that we are not bound by the federal retroactivity framework, yet we decide to follow it anyway.  In my view, this raises two concerns.

¶89    First, the plurality adopts the federal retroactivity framework on the premise that we have consistently applied this framework and, therefore, stare decisis compels us to continue to do so.  However, closer scrutiny of our retroactivity jurisprudence in this regard reflects that it finds its origin in the mistaken premise that we were bound to follow the federal framework when, in fact, we were not.  I would decline to perpetuate this mistake in this case.  If we elect to continue on this path, however, I believe it is incumbent upon us to acknowledge it is by choice and not federal mandate.

¶90    Second, the federal framework is contrary to controlling Montana law.  The federal framework reflects the U.S. Supreme Court's interpretation of the federal habeas corpus statutes.  Montana's habeas statutes—which I contend should be applied in this case—compel a different result.  Our own habeas corpus statutes indicate different restrictions than those created by the federal framework.  I believe the conflict between the restrictions our statutes impose on retroactivity and the restrictions the federal

50

framework imposes should be resolved in favor of our statutes, rather than the U.S. Supreme Court's interpretation of the federal statutes.

¶91    The plurality's position appears to be that we should apply *Teague* in this case because we have consistently applied *Teague*, even since the Supreme Court has made it clear that we are not compelled to do so, and Beach has not demonstrated that our prior jurisprudence is manifestly wrong.  Moreover, Beach has only pointed out that we are free to adopt a more expansive retroactivity rule, but has not developed or tested any alternative rule.  I address first the plurality's concerns about the stare decisis effect of our prior jurisprudence, and then the concern about the lack of an alternative rule.  I would submit that stare decisis does not compel us to follow *Teague*, that there is in fact an alternative retroactivity rule contained in our own habeas statutes and pre-*Egelhoff* opinions, and that we are bound to follow that rule rather than *Teague*.

¶92    ***I. Stare Decisis Is Inapplicable When Our Prior Precedent is Based on Manifest Legal Error***

¶93    In *State v. Egelhoff*, we mistakenly assumed we were bound by the federal retroactivity framework.  Specifically, we held: "[*Teague*'s] view of retroactivity for cases on collateral review *is binding upon this Court*."  *State v. Egelhoff*, 272 Mont. 114, 126, 900 P.2d 260, 267 (1995) (emphasis added).  In 2008, the U.S. Supreme Court explained that we were wrong in *Egelhoff*, and that we are not bound to follow federal retroactivity rules.  In *Danforth v. Minnesota*, the U.S. Supreme Court held that "[s]ince *Teague* is based on statutory authority that extends only to federal courts applying a federal statute, it cannot be read as imposing a binding obligation on state

51

courts." *Danforth v. Minnesota*, 552 U.S. 264, 278–79, 128 S. Ct. 1029, 1040 (2008). As the plurality correctly notes, the U.S. Supreme Court explicitly addressed our mistaken interpretation of *Teague* as being binding upon us. *See Danforth*, 552 U.S. at 281, 128 S. Ct. at 1042 (citing *Egelhoff* and noting Montana as one of only three state courts to mistakenly assume we were bound by federal retroactivity rules).

¶94 This Court has only addressed *Danforth* once, in *State v. Reichmand*, 2010 MT 228, 358 Mont. 68, 243 P.3d 423. The *Reichmand* opinion contains two significant mistakes. First, we held in *Reichmand* that we voluntarily adopted the retroactivity rule in *Teague,* stating: "In *State v. Egelhoff . . .* we *chose* to adopt two [retroactivity] rules from *Griffith* and *Teague* and applied them to our own retroactive application of new state rules." *Reichmand*, ¶ 14 (emphasis added). In fact, we did not choose to adopt the *Teague* retroactivity rule in *Egelhoff*; we mistakenly concluded we were bound to follow the *Teague* retroactivity rule. *Egelhoff*, 272 Mont. at 126, 900 P.2d at 267.

¶95 Second, *Reichmand* mistakenly summarized the holding in *Dansforth* as stating that states may adopt their own retroactivity rules for new state constitutional errors, but not for new federal constitutional rules:

> The U.S. Supreme Court recently held that each state has the right to craft its own unique retroactivity jurisprudence, using federal requirements as a floor. That is, the U.S. Supreme Court's retroactivity analysis for *federal* constitutional errors is binding upon the states when *federal* constitutional errors are involved. *Danforth's* unequivocal grant of flexibility allows states to hand-pick retroactivity rules for application of new *state* rules.

52

*Reichmand*, ¶ 13 (emphasis in original) (citation omitted). At first blush, this seems correct—and indeed it would be correct if retroactivity arose from the new constitutional rules themselves. *Danforth*, however, held that retroactivity arises not from the constitutional rule itself, but from the remedy—that is, the federal habeas corpus statutes. Since the federal retroactivity framework derives from the federal habeas statutes—which are applicable only to federal courts—it cannot be binding on state courts. *Danforth*'s holding states this clearly: "Since *Teague* is based on statutory authority that extends only to federal courts applying a federal statute, it cannot be read as imposing a binding obligation on state courts." *Danforth*, 552 U.S. at 278–79, 128 S. Ct. at 1040. Thus, *Reichmand*'s assertion that the federal framework "is binding upon the states when *federal* constitutional errors are involved" is incorrect.

¶96 *Reichmand*'s summary of *Danforth* mirrors the *Danforth* dissent's argument, not the majority opinion. The *Danforth* dissent argued that retroactivity arises from the opinion granting the new constitutional right, not the federal habeas statutes. Thus, the dissent reasoned that states are free to craft whatever retroactivity rules they wish for new state constitutional rules, but are bound by the federal retroactivity framework for new federal constitutional rules. Specifically, the dissent argued:

> State courts are the final arbiters of their own state law; this Court is the final arbiter of federal law. State courts are therefore bound by our rulings on whether our cases construing federal law are retroactive. . . . States [can] apply their own retroactivity rules only to new substantive rights under their own law, not to new federal rules announced by this Court.

53

*Danforth*, 552 U.S. at 291–92, 295, 128 S. Ct. at 1047, 1049 (Roberts, C.J., dissenting) (internal quotations omitted). It appears that in *Reichmand* we mistakenly summarized the dissenting opinion in *Danforth*, rather than the actual holding.

¶97 To summarize, we mistakenly believed ourselves bound by the federal retroactivity rules in *Egelhoff*. The U.S. Supreme Court pointed out our mistake, and effectively overruled it, in *Danforth*. *Reichmand* addressed *Danforth*, but misread *Egelhoff* as a voluntary adoption of the federal rule, and then perpetuated the mistaken belief that we must follow the federal framework when determining the retroactivity of new federal constitutional rules. The only case in which we addressed retroactivity since *Reichmand*, was *State v. Cook*, 2012 MT 34, 364 Mont. 161, 272 P.3d 50, which followed *Reichmand* and the federal rules without substantive discussion. This is the jurisprudence upon which the plurality relies in determining that *Teague* articulates the appropriate retroactivity rule in Montana.

¶98 The plurality opinion acknowledges the mistake we made in *Egelhoff*, but not its broader implication. As the plurality points out: "Under this Court's policy of stare decisis, we keep faith with precedent 'unless it is demonstrably made to appear that' our precedent 'manifestly is wrong.'" Opinion, ¶ 29 (quoting *State ex rel. Perry v. District Court*, 145 Mont. 287, 310, 400 P.2d 648, 660 (1965) (internal quotations omitted)). Since the U.S. Supreme Court has explicitly told us our precedent is wrong, and we have never corrected that mistake, I contend that qualifies as "'demonstrably made to appear that' our precedent 'manifestly is wrong.'"

¶99 This case marks the first time that a party has asked us to reconsider our retroactivity rule in light of *Danforth*. The parties in *Reichmand* did not mention *Danforth*, much less ask us to depart from federal retroactivity jurisprudence. *See generally Appellant's Brief* and *Appellee's Brief, State v. Reichmand* (DA 09-0057). It is clear that neither *Egelhoff* nor *Reichmand* voluntarily adopted *Teague* as Montana's retroactivity rule, since *Egelhoff* erroneously concluded the federal rules were binding upon us, and *Reichmand* erroneously concluded that *Egelhoff* was a voluntary adoption of the federal rules. The Court's opinion here marks the first time we have acknowledged that we are not bound by federal retroactivity rules and, therefore, marks our first conscious, voluntary adoption of *Teague*. A plurality of this Court seems to favor this course of action and, consequently, may adopt *Teague* as our rule. However, I am concerned that the only basis for our adoption of the federal framework is "precedent" that is merely ostensible at best and manifestly wrong at worst.

¶100 The plurality asserts that we voluntarily adopted the federal framework in *Reichmand*, contending: "After acknowledging our ability to choose any standard, [*Reichmand*] applied the federal retroactivity framework." Opinion, ¶ 28. However, *Reichmand* was grounded upon the misapprehension that we had already chosen to adopt the federal framework in *Egelhoff*, as we unambiguously expressed: "In *State v. Egelhoff*, we chose to adopt [the federal framework] and applied them to our own retroactive application of new state rules. . . . Thus, *Goetz* will retroactively apply to Reichmand if the requirements established in *Egelhoff* are met." *Reichmand*, ¶¶ 14–15. It is beyond

55

dispute that we did not choose to adopt the federal retroactively framework in *Egelhoff*; we mistakenly believed ourselves bound to adopt it.[1]  Since *Reichmand* failed to acknowledge that mistake—instead erroneously characterizing our adoption of the federal framework in *Egelhoff* as a "choice"—I remain unconvinced that this Court has ever voluntarily adopted the federal framework before today.  If the plurality sees fit to do so with this opinion, that is certainly its prerogative.  I submit only that we are creating precedent today rather than following it.

¶101  ***II.  The Appropriate Retroactivity Rule Under Montana Law***

¶102  As Justice Harlan noted of the U.S. Supreme Court's retroactivity jurisprudence prior to *Teague*: "Clearly, it is at least fair to regard this issue as not yet settled by this Court.  Consequently, I go on to inquire how it ought to be resolved."  *Mackey v. United States*, 401 U.S. 667, 688, 91 S. Ct. 1160, 1165 (1971) (Harlan, J., concurring and dissenting).

¶103  Since the federal retroactivity rules are based on the federal habeas corpus statutes, a natural place to begin an analysis of the correct retroactivity rule for Montana would be the Montana habeas corpus statutes.  The Montana writ of habeas corpus is defined by § 46-22-101(1), MCA, and provides that "every person imprisoned or otherwise restrained of liberty within this state may prosecute a writ of habeas corpus to inquire into

---

[1] It is also worth noting that *Egelhoff* did not involve any new state rules.  The *Egelhoff* opinion was based entirely on federal law as evidenced by the U.S. Supreme Court's reversal of our decision there.  *See Montana v. Egelhoff*, 518 U.S. 37, 116 S. Ct. 2013 (1996).  Thus, *Egelhoff* could not have adopted the federal retroactivity rules and applied them to new state rules.

the cause of imprisonment or restraint and, if illegal, to be delivered from the imprisonment or restraint." Section 46-22-101(1), MCA.

¶104 "In the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA. We should not, then, insert restrictions into our own habeas corpus statute that the Legislature has chosen to omit. Moreover, "When a statute is equally susceptible of two interpretations, one in favor of natural right and the other against it, the former is to be adopted." Section 1-2-104, MCA. To the extent we might interpret the habeas statute to include restrictions against natural rights, we are instructed not to do so if the statute is equally susceptible of an interpretation in favor of natural rights.

¶105 This being noted, the seemingly broad right granted by § 46-22-101(1), MCA, is appropriately constrained by § 46-22-102, MCA, which places a restriction on what sorts of claims may be raised in a habeas proceeding, and which may be subject to the retroactive application of new constitutional rules on habeas review. This statute provides: "A person may not be released on a writ of habeas corpus due to any technical defect in commitment not affecting the person's substantial rights." Section 46-22-102, MCA. Unlike § 46-22-101(2), MCA, which we held unconstitutional in *Lott v. State*, 2006 MT 279, 334 Mont. 270, 150 P.3d 337, § 46-22-102, MCA, comports with both the

protection of the writ enshrined in the Montana Constitution and the historical purposes of habeas corpus.[2]

¶106 Thus, I believe that the only restriction with support in Montana law would be a restriction that prevents claims that raise only technical defects that do not affect the petitioner's substantial rights. An appropriate definition of a "technical defect" can be located in *Coleman v. State*, 194 Mont. 428, 633 P.2d 624 (1981), a habeas case that predates *Egelhoff*'s mistaken determination that we were bound by *Teague*. In *Coleman*, we held that a new constitutional rule was not retroactive because it was "not one aimed at overcoming an aspect of the criminal trial that substantially impairs its truth-finding function thereby raising questions as to the accuracy of guilty verdicts in past trials." *Coleman*, 194 Mont. at 503, 633 P.2d at 670. Based on that reasoning, an appropriate definition of a "technical defect" would be one that does not raise significant questions as to the accuracy of the verdict or the sentence.

¶107 A technical defect restriction on habeas review would mean that some categories of new constitutional rules appropriately would never be retroactive. For example, new search and seizure rules and the attendant exclusionary rule would not be retroactive because their violation does not undermine confidence in the validity of a conviction or sentence. As we noted in *Coleman*: "[T]he purpose of the exclusionary rule to deter

_____

[2] "'From the time of the Magna Charta, the Great Writ of Habeas Corpus has been liberally employed as a means of guaranteeing that [justice] be accomplished and that a miscarriage of justice will be remedied. For at its heart, the writ represents an acknowledgment of the principle that the rights of freedom of the individual are worthy of protection.'" *Lott*, ¶ 20 (quoting *State v. Perry*, 232 Mont. 455, 462–63, 758 P.2d 268, 273 (1988) (*overruled on other grounds by State v. Clark*, 2005 MT 330, 330 Mont. 8, 125 P.3d 1099)) (citation omitted).

police misconduct is not served at the post-appeal stage and application of the exclusionary rule deflects the truth-finding process." *Coleman*, 194 Mont. at 503, 633 P.2d at 670. Since our own habeas statutes forbid only habeas claims based on "technical defects," and our prior habeas jurisprudence suggests an appropriate definition of "technical defect," I believe we compound our previous errors by adopting *Teague* when we clearly are not bound to do so, and we have a more compelling alternative.

¶108 Since there is a statutory basis for a Montana-specific retroactivity rule, I submit we are bound to follow the Montana-specific rule over one based on *Teague*. The U.S. Supreme Court has stated that the federal retroactivity framework arises from interpretation of the federal habeas corpus statutes, not the U.S. Constitution: "*Teague* is based on *statutory* authority that extends only to federal courts applying a federal *statute*, it cannot be read as imposing a binding obligation on state courts." *Danforth,* 552 U.S. at 278–79, 128 S. Ct. at 1040 (emphasis added). Since the federal retroactivity framework finds no basis in the U.S. Constitution, the Montana Constitution, nor the statutes of this state, our adoption of it here can only be characterized as common law. Where the common law and statute conflict, the statute shall take precedent. Section 1-1-108, MCA, states:

> In this state there is no common law in any case where the law is declared by statute. But where not so declared, if the same is applicable and of a general nature and not in conflict with the statutes, the common law shall be the law and rule of decision.

At a minimum, this means that before we may adopt a common law rule, we must ascertain that it is "not in conflict with the statutes." Comparing the one restriction

placed on habeas corpus by our statutes and *Teague*'s restrictions based on the distinction between substantive and procedural rights evinces a conflict between *Teague* and Montana statutes. Therefore, I contend we are compelled to follow our statutes over *Teague*.

¶109 Similarly, I believe our prior resolution of a similar issue regarding restrictions on which fundamental rights may be asserted in a collateral proceeding dictates that we should follow Montana statutory law rather than the U.S. Supreme Court's non-binding opinions. In *State v. Maine*, we rejected the U.S. Supreme Court's restriction on which constitutional rights may be asserted in a collateral challenge to a prior conviction. *State v. Maine*, 2011 MT 90, ¶¶ 31–32, 360 Mont. 182, 255 P.3d 64. *Maine* addressed whether defendants could collaterally attack a prior conviction as unconstitutional when that conviction was being used to enhance punishment for a later crime—in effect, the question was whether you can hold a mini-habeas proceeding attacking a prior conviction in the middle of sentencing for a later crime. At the time that we were deciding *Maine*, the U.S. Supreme Court had decided *Custis v. United States,* 511 U.S. 485, 114 S. Ct. 1732 (1994), in which it held that such a collateral attack could occur only if the prior conviction violated *Gideon.* The State asked us to adopt *Custis* out of considerations of finality and judicial economy. *See Maine*, ¶¶ 16–17 (citing *Custis*). We rejected the U.S. Supreme Court's reliance on judicial economy and finality as justification for limiting which constitutional rights may be asserted on collateral review because we saw no principled basis for distinguishing between fundamental rights. We held: "[W]e disagree

60

with the premise that some [fundamental] rights are sufficiently 'unique' to merit consideration in collateral challenges, while others are not so deserving. . . . [T]he existence of administrative burdens in evaluating collateral challenges does not justify limiting the particular rights which may be asserted." *Maine*, ¶¶ 31–32. The concurrence further noted:

> While the strong interest in finality of judgments supports placing a limit on collateral attack of underlying convictions, there is no textual basis for a rule that allows such attack for the violation of one fundamental right but not for the violation of another, equally fundamental right. I therefore agree with the Court's decision to reject that artificial distinction in favor of a rule of convenience.

*Maine*, ¶ 45 (Baker, J., concurring). That reasoning is instructive in the present case. Similar to *Custis*, *Teague* allows some constitutional rights to be asserted on collateral review, but not others. As the *Maine* concurrence made clear, where there is no basis in Montana law for the particular distinctions the federal courts make between fundamental rights, we should decline to follow the federal rule. *Teague*'s distinction between substantive and procedural rights finds no basis in Montana law. The same considerations that led us to reject *Custis* should apply with equal force in considering whether to adopt *Teague*.

¶110 I agree whole-heartedly with the *Maine* concurrence that the strong interest of finality of judgments supports placing a limit on collateral attacks, and that any such limit should arise from a textual basis. While there is no such textual basis for limitations on which rights may be asserted in the type of proceeding discussed in *Maine*, our habeas statutes and pre-*Egelhoff* opinions constitute an appropriate textual basis for limitations

61

on collateral attack in habeas proceedings. For that reason, I believe the appropriate—indeed, the mandatory—course would be to follow the statutes' limitations rather than *Teague*'s, which have no basis in Montana law.

¶111 I share the plurality's concern about the parties neither proposing nor testing a retroactivity rule alternative to *Teague*. I am not convinced, however, that Beach's failure to propose an alternative necessarily means we cannot inquire into the appropriate retroactivity rule.

¶112 I would note that the parties in *Teague* did not ask the U.S. Supreme Court to reexamine its retroactivity rules, nor did they develop or test a new proposed rule as the plurality suggests must be done before this Court can adopt a new rule. Rather, the *Teague* Court sua sponte adopted a new rule because it determined that its retroactivity analysis needed to be clarified in light of the lack of a unifying theme in its prior precedent. *Teague*, 489 U.S. at 300, 109 S. Ct. at 1069–70. If the lack of a unifying theme is sufficient for the U.S. Supreme Court to sua sponte reexamine its rules and adopt an entirely new approach, then I contend a line of precedent founded on a mistaken legal assumption warrants similar reexamination of our own rules when a party has expressly asked us to do so.

¶113 More importantly, the circumstances here do not implicate our usual concern about adopting a new rule that was not argued by the parties. Whether we adopt *Teague* or some other rule, we will be adopting a rule that was not argued by the parties. No party has ever asked us to adopt *Teague*; therefore, its merits have never been tested in

the manner the plurality suggests must happen before we adopt a new rule. The plurality asserts that we adopted the federal framework in *Reichmand*. Opinion, ¶ 28. Assuming that were correct, then we adopted the federal framework without any of the argument the plurality asserts is a necessary antecedent to adoption of a new rule. Thus, we have either already adopted a rule that no party has ever argued, or we must do so here. Moreover, the rule I am proposing we adopt is merely a plain-language interpretation of our habeas statutes. It is our job to state what the relevant law is when deciding a case, and the habeas statutes' plain language provides us ample guidance to state the appropriate retroactivity rule for Montana.

¶114 This case provides us with the choice of either grounding our retroactivity rule on Montana statutory law or on a precedent that both the U.S. Supreme Court, and the plurality, recognize was incorrectly decided. I would choose the former. Retroactivity should not rest on a distinction between substantive versus procedural as per *Teague,* but rather should be an analysis as to whether the claim raises merely a technical defect that does not affect the person's substantial rights as per § 46-22-102, MCA. I submit that the right to be sentenced in conformity with the Eighth Amendment of the U.S. Constitution and Article II, § 22 of the Montana Constitution is a substantial right which merits retroactive application. In this case, since *Miller*, *Roper*, and *Graham* have held that sentencing a youth implicates these substantial rights, and the record is completely devoid of any indication that the sentencing judge "[took] into account how children are different, and how those differences counsel against irrevocably sentencing them to a

63

lifetime in prison" when sentencing, *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469, I would remand the case for the District Court to consider Beach's youth at the time he committed the crime. Some juvenile offenders may commit crimes so heinous that they warrant incarceration for life. Indeed, it may be that Beach merits the same sentence, even after considering his youth at the time of the crime. But before that sentence is imposed, the District Court should explicitly consider whether Beach was "'the rare juvenile offender whose crime reflects irreparable corruption,'" and not "'the juvenile offender whose crime reflects unfortunate yet transient immaturity.'" *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469 (quoting *Roper*, 543 U.S. at 573, 125 S. Ct. at 1197; *Graham*, 560 U.S. at 68, 130 S. Ct. at 2026).

/S/ JAMES JEREMIAH SHEA

Justice Patricia Cotter, dissenting.

¶115 I dissent from the Court's denial of Beach's petition. While I agree with some of the arguments set forth in both Justice Wheat's and Justice Shea's dissents, I write separately to assert that, even if one were to accept the Plurality Opinion's analysis of retroactivity, reversal and remand is still required because the *Miller* sentencing consideration rule is a substantive rule which should be applied retroactively to Beach's claim on collateral review.

¶116 In *Schriro v. Summerlin*, the United States Supreme Court held that substantive rules apply retroactively, and it included as a substantive rule one which "alters the range

64

of conduct or the class of persons that the law punishes" and "place[s] particular conduct or persons covered by the statute beyond the State's power to punish." It observed that within this category are rules that prohibit punishment for a class of defendants because of their status or offense. *Schriro*, 542 U.S. at 352-53, 124 S. Ct. at 2522-23. Youth is clearly a "status." As observed in *Wilson*, 233 Cal. App. 4th 544 (2015) (review granted April 15, 2015, S224745, briefing deferred), the *Schriro* court concluded that "[s]uch rules apply retroactively because they carry a significant risk that a defendant . . . faces a punishment that the law cannot impose upon him." *In re Wilson*, 233 Cal. App. 4th at 559-60 (quoting *Schriro*, 542 U.S. at 352, 124 S. Ct. at 2523) (internal quotation marks omitted). Here, that punishment is Beach's effective sentence of life without parole.

¶117 As the Plurality Opinion correctly observes, *Miller* requires a sentencing court to "'follow a certain process' before imposing a life without parole sentence on a juvenile." Opinion, ¶ 32. The Plurality Opinion seizes upon the reference to "process" and concludes citing *Schriro* that the sentencing consideration rule under *Miller* "regulates only the manner of determining a sentence," (Opinion, ¶ 39), and is therefore procedural. I disagree. I would conclude, as did the Court of Appeals of California on April 16, 2015, that *Miller* announces a new substantive rule, which should be retroactively applied to cases on collateral review.

¶118 In *Willover*, the court addressed the 1999 conviction and sentence of a 17-year-old defendant who was convicted of two counts of first-degree murder, together with other crimes. *In re Willover*, 2015 Cal. App. LEXIS 322 (Cal. App. 6th Dist. Apr. 16, 2015).

Willover was sentenced to two consecutive life without parole terms (LWOP) for the first-degree murders, with additional imprisonment terms imposed for the other crimes. The court noted that at the time of the 1999 sentencing hearing, a California statute had been construed as creating a presumption in favor of life without parole as the appropriate penalty for juveniles convicted of "special circumstance murder." *In re Willover*, 2015 Cal. App. LEXIS 322 at *9. However, the sentencing scheme was not mandatory.

¶119 Apropos of the foregoing reference by the Plurality Opinion to "process," and citing cases from other courts around the country, the *Willover* court concluded that *Miller*

> effectively "alter[ed] the range of conduct or the class of persons that the law punishes" [*Schriro*, 542 U.S. at 353, 124 S. Ct. at 2523], in that it barred LWOP sentences for juvenile homicide offenders unless the sentencing court determines, after a consideration of a number of case-specific substantive factors, that the defendant is "'the rare juvenile offender whose crime reflects irreparable corruption.' [citations]." [*Miller*, 132 S. Ct. at 2469]. *Miller* did not simply set forth a new rule regulating "the *manner of determining* the defendant's culpability," but a rule that sets forth the specific considerations to be made during a sentencing decision. [*Schriro*, 542 U.S. at 353, 124 S. Ct. at 2523].

*In re Willover*, 2015 Cal. App. LEXIS 322 at *20-21 (emphasis in original). Thus, the court concluded that *Miller* announced a substantive rule.

¶120 The *Willover* court also found it significant that when the Supreme Court granted relief in *Miller*, it granted relief in the companion case of *Jackson v. Hobbs*, directing that the defendant in that case also be given a new sentencing hearing. *In re Willover*, 2015 Cal. App. LEXIS 322 at *21. Notably, *Jackson* arose on collateral review, and yet the

66

Supreme Court saw no reason to direct a different outcome in that case, suggesting that the *Miller* court may have considered its decision substantive.

¶121   As the Plurality Opinion observes at ¶ 35, there is a split of authority on the question of whether *Miller* announces a procedural or a substantive rule.   In fact, the Supreme Court very recently granted a petition for writ of certiorari in *Montgomery v. Louisiana*, No. 14-280, on the question of whether *Miller* should be applied retroactively. *See State v. Montgomery*, 141 So. 3d 264, 2014 La. LEXIS 1538 (2014), *cert. granted*, *sub nom. Montgomery v. Louisiana*, 2015 U.S. LEXIS 1942 (U.S. Mar. 23, 2015).   In concluding that the rule in *Miller* is procedural rather than substantive, the Plurality Opinion finds company in the decisions of other courts.   However, so too does this Dissent.  The question is clearly unsettled.

¶122   Among the factors cited in *Miller* as appropriate for consideration at sentencing are "chronological age and its hallmark features-among them, immaturity, impetuosity, and failure to appreciate risks and consequences."   *Miller*, 132 S. Ct. at 2468.   In *Graham*, 560 U.S. at 79, 130 S. Ct. at 2032, the Supreme Court stated:  "Life in prison without the possibility of parole gives no chance for fulfillment outside prison walls, no chance for reconciliation with society, no hope.  Maturity can lead to that considered reflection which is the foundation for remorse, renewal, and rehabilitation."   The Supreme Court recognized that life without parole "forswears altogether the rehabilitative ideal" and "improperly denies the juvenile offender a chance to demonstrate growth and maturity."  *Graham*, 560 U.S. at 73-74, 130 S. Ct. at 2029-30.

¶123   I would conclude that the rule in *Miller* is substantive and that Beach should be resentenced.  I would direct the court on remand to take into account Beach's youth at the time his crime was committed, as well as Beach's demonstration of growth and maturity over the past thirty years.  As *Willover* instructs, I would direct the court to determine upon consideration of these factors whether Beach is or is not "the rare juvenile offender whose crime reflects irreparable corruption."  *In re Willover*, 2015 Cal. App. LEXIS 322 at *20 (quoting *Miller*, 132 S. Ct. at 2469).  I therefore dissent from the Court's denial of Beach's petition.

/S/ PATRICIA COTTER